UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| In re: | CHAPTER 11 |
| SACKS WESTON LLC | Case No. 23-12540 (PMM) |
| Debtor |  |

**DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS
(I) DETERMINING THAT CERTAIN FUNDS ARE NOT CASH COLLATERAL;
(II) TO THE EXTENT THERE IS CASH COLLATERAL, AUTHORIZING USE
THEREOF AND GRANTING PROVISIONAL ADEQUATE PROTECTION;
(III) SCHEDULING AN EXPEDITED HEARING;
AND (IV) GRANTING RELATED RELIEF**

Sacks Weston LLC (the "Firm" or "Debtor"), by and through its proposed counsel, Smith Kane Holman, LLC, hereby moves this Court for the entry of interim and final orders (i) determining that certain funds are not cash collateral; (ii) authorizing the Debtor to use alleged cash collateral and to the extent thereof granting provisional adequate protection to the Debtor's pre-petition secured creditors; (iii) scheduling an expedited hearing on the relief requested herein; and (iv) granting related relief (the "Motion"). In support of the Motion, the Debtor respectfully represents as follows:

**Jurisdiction and Venue**

1. The Debtor filed its voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), on August 25, 2023 (the "Petition Date") and continues in possession of its property and operating its business as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

2. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The statutory predicates for the relief sought herein are sections 105 and 363 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

5. As of the date hereof, there has been no Official Committee of Unsecured Creditors formed in this case.

## Background

6. The Debtor, Sacks Weston LLC, with variations in named partners and corporate forms, traces its history to the early 1980s. Since 1994, the Firm's primary practice area has been complex litigation—including class action and qui tam litigation—but it has also provided representation for clients in the areas of personal injury and subrogation.

7. The Firm's complex litigation began in the context of personal and property injuries from radioactive contamination caused by oil production operations. The Firm prosecuted dozens of actions in both state and federal courts, with the litigation culminating in a jury award of one billion dollars in punitive damages.[1] The Firm's early complex litigation work also included prosecuting numerous other class actions, including Microsoft antitrust and Neurontin litigation. Internationally, the Firm was part of the U.S. legal team that prosecuted the European Community's RICO and money laundering claims against American, British and Japanese tobacco companies.

8. The current corporate form of the Firm began in January 2012, under the name Sacks, Weston & Petrelli, LLC, when the Firm expanded and diversified its practice to include an hourly-based family law practice to compliment the pending complex, contingency-based

---

[1] See https://www.law.com/nationallawjournal/almID/900005509355/.

cases.

9. By 2013, the Firm's international tobacco litigation had concluded, and the Firm further expanded its practice under the name Sacks, Weston, Petrelli & Diamond, LLC and then Sacks, Weston, Petrelli, Diamond & Millstein, LLC, beginning a series of new complex cases and bolstering its practice with lawyers handling personal injury and subrogation claims.

10. In 2015, the Firm changed to Sacks Weston Millstein Diamond, LLC and then Sacks Weston Diamond, LLC when the Firm no longer had its family law practice.

11. During this time period, to finance these new complex cases, the Firm took out loans from so-called litigation funders, which are specialized lenders that generally lend to law firms to finance specific cases and those loans are collateralized with a lien on the proceeds from those specific cases.

12. Specifically, on or about February 6, 2015, the Firm obtained litigation funding from an entity known as Series 2 - Virage Master LP, which lent the Firm the principal sum of $2,575,000.00 and collateralized that Loan with the proceeds of certain specified cases against which the money was lent, all consistent with industry custom and practice.

13. Thereafter, on August 12, 2016, the Firm obtained an additional loan from another Virage-related entity known as Series 4 – Virage Master LP under similar terms to the foregoing loan from Series 2 – Virage Master LP.

14. Subsequently, on June 5, 2017, the Firm—which at the time was called Sacks Weston Diamond, LLC—entered into a loan agreement with Virage SPV 1 LLC ("Virage") that effectively refinanced and consolidated the two aforementioned Virage Master LP loans and provided a small additional advance of funds (the "Virage Loan"). A true and correct copy of the Loan Agreement for the Virage Loan is attached hereto and incorporated herein by reference

3

as Exhibit "A".

15. In total, the promissory note signed in connection with the Virage Loan was for the amount of $5,794.960.92. See Exhibit A § 2.1. The guarantors for the Virage Loan were the Firm principals at that time, Andrew B. Sacks ("Sacks"), John K. Weston ("Weston") and Scott E. Diamond ("Diamond").

16. The Firm believed and indeed treated the Virage Loan in a manner similar to all prior loans with Virage-related entities insofar as the proceeds from the specific cases funded by Virage would act as collateral for the Virage Loan.

17. Nevertheless, the Virage Loan terms were onerous and had viability only if the Firm was able to recover on cases relatively quickly because the principal balance of the loan accrued interest at an annual rate of 22.5% and was secured by certain of the Firm's case proceeds (the "Virage Collateral") where 60% of such proceeds—i.e., more than half of whatever the Firm recovered—were required to be paid to Virage upon receipt by the Firm.[2] See Exhibit A § 2.4(b). The maturity date of the Virage Loan was June 5, 2021. See Exhibit A § 2.3.

18. In July 2020, the Firm terminated Diamond and removed him as a member of the Firm because of alleged fraud involving the diversion of Firm revenues. As a result, the Firm name was changed to its present name, Sacks Weston, LLC.

19. The combined economic consequences associated with the staggering amount of the Firm's revenues being diverted by Diamond and the ensuing upheaval occurring at the Firm through the loss of what was thought to be an integral part of the Firm's practice and cash flow, caused the Firm to identify possible refinancing sources to address the impending Virage Loan

---

[2] The Security Agreement executed between the parties and the UCC-1s filed by Virage to secure the Virage Loan (and predecessor loans) are attached hereto as Exhibit "B" and Exhibit "C", respectively.

maturity date in June 2021. Unfortunately, despite the fact that the Firm was able to secure refinancing commitments through multiple lenders, the amount of funding was insufficient to cover the exorbitant interest being charged by Virage, and when Virage refused to compromise its indebtedness, the Firm was not able to refinance the Virage Loan or retire it by the June 6, 2021 maturity date. Instead, Virage agreed only to formally extend the loan maturity date for a mere three weeks until June 26, 2021.

20. On June 24, 2022, the United States Attorney's Office charged Diamond with one count of mail fraud and one count of wire fraud. In November 2022, Diamond pled guilty to the charges, and Diamond was sentenced to six months imprisonment and was required to pay restitution to the Firm in the amount of $319,931.13—an amount far less than what was believed to have been diverted from the Firm.

21. As more specifically described below, in May 2023, the Firm received a payment on account of the restitution only in the amount of $274,913.13, which the Firm deposited into its operating account and used to pay its operating expenses.

22. On March 24, 2023, Virage filed suit against the Firm and the guarantors of the Virage Loan (the "Virage Suit") in the Court for the 152nd Judicial District of Harris County, Texas (the "Harris County Court"). In the Virage Suit, Virage filed an Amended Petition and Application for Temporary Restraining Order and Temporary Injunction on July 31, 2023.

23. On July 31, 2023, the Harris County Court entered a Temporary Restraining Order directing the Firm (and other named defendants) to: (1) refrain from transferring, selling, or encumbering certain claimed collateral, (2) disclose to Virage the payment status and identity of the claimed collateral, and (3) deposit claimed collateral proceeds into the Registry of the Harris County Court.

24. On August 14, 2023, the Harris County Court held a hearing on the temporary injunction requested by Virage.

25. On August 18, 2023, the Harris County Court entered a temporary injunction—largely mirroring the Temporary Restraining Order—which directed the Firm (and other named defendants) to: (1) refrain from transferring, selling, or encumbering certain claimed collateral, (2) disclose to Virage the payment status and identity of the claimed collateral, and (3) deposit 60% of certain claimed collateral proceeds into the Registry of the Harris County Court within 7 days (the "Temporary Injunction").[3]

26. Without sufficient working capital, the Firm would be rendered inoperable, thereby preventing it from servicing its existing files (which are believed to have value in the millions) and from taking on new cases.

27. Accordingly, on August 25, 2023 (the "Petition Date"), the Firm had no choice but to file its voluntary petition under chapter 11 of the Bankruptcy Code.

28. On September 5, 2023, Weston, who is a named Defendant in the Virage Suit, filed a Notice of Removal with the United States District Court for the Southern District of Texas (Houston Division) and intends to seek a change of venue of the Virage Suit to this Court.

**Debtor's Prepetition Secured Debt and Deposit Account Funds**

29. As noted, the Firm granted a prepetition security interest in certain case proceeds to Virage in connection with the Virage Loan, and Virage filed certain UCC-1 financing statements. See Exhibits B and C.

30. A search of the Pennsylvania Department of State Uniform Commercial Code records indicates that, other than Virage, only the Commonwealth of Pennsylvania Department

---

[3] The Temporary Injunction is attached hereto as Exhibit "D".

6

of State (the "PA DOS," and collectively with Virage, the "Secured Creditors") has filed UCC-1 financing statements, and those financing statements purport to perfect a security interest in the Debtor's personal property.[4]

31.     Despite efforts to do so, the Debtor has not been able to confirm how much, if any, is owing to the Commonwealth of Pennsylvania.  According to the filed UCC-1s, however, the PA DOS's liens secure debt attributable to unpaid annual registration fees required by Section 8998 of the Limited Liability Company Law of 1994.

32.     The Debtor's Bankruptcy Schedule A/B reflects the following assets: (1) leaseholder interests and rights under subleases; (2) an operating account and payroll account;[5] (3) the contents of the Debtor's leased premises; (4) computers and software; (5) artwork; (6) a domain name; (7) causes of action asserted against Virage as counterclaims in the Virage Suit; and (8) its pending cases.

33.     Other than the account balances in the aforementioned operating account and the payroll account (collectively, the "Accounts"), which, as of the Petition Date, were $91,281.09 and $7,221.50, respectively (collectively, the "Account Funds"), the Debtor was unable to value its remaining assets because it does not have a recent valuation thereof or, in the case of the legal files, their value is entirely contingent upon the recovery thereon.

34.     The Debtor avers that the Secured Creditors did not have a valid and perfected security interest in the Account Funds on the Petition Date.[6]

---

[4]     The UCC-1s filed by the PA DOS are attached hereto as Exhibit "E".

[5]     The Debtor also scheduled for notice purposes its IOLTA account, which consists of funds held in trust for others and are not the Debtor's property.

[6]     The Debtor notes that, in the August 18 Temporary Injunction, the Harris County Court made certain interim findings regarding the "probable injury and likelihood of success on the merits" of the Virage Suit.  These interim findings included statements regarding the nature and extent of Virage's

35. By this Motion, the Debtor seeks a determination from this Court that the Account Funds are not "cash collateral" under 11 U.S.C. § 363(a) or, alternatively, to the extent that the Account Funds constitute cash collateral of either or both of the Secured Creditors, the Debtor seeks to use such cash collateral by providing the Secured Creditors with adequate protection in the form of replacement liens on certain post-petition assets and/or through the maintenance of the value of the Secured Creditor's respective collateral by continuing to operate the Firm in the ordinary course.

36. The Debtor needs immediate use of cash to pay ordinary and necessary expenses, such as rent and payroll; accordingly, this Motion is being filed on an expedited basis because the Debtor initially and immediately seeks an interim order for use of cash collateral.

## The Account Funds Are Not Cash Collateral

37. The Account Funds are not "cash collateral" under 11 U.S.C. § 363(a) because no party holds a perfected security interest therein.

38. Section 363(a) defines cash collateral as:

> . . . cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

---

Collateral under the Loan Agreement. The Debtor disputes these interim findings, which are subject to a timely appeal. Such interim findings were necessary to adjudicate Virage's request for a temporary injunction, and the Temporary Injunction was entered solely to preserve the status quo pending trial. The interim findings in the Temporary Injunction do not constitute a final judgment on any disputed issue of fact or law in the Virage Suit and it is submitted are not binding on the Debtor in the Harris County Court, this bankruptcy case, or any other court.

39. Implicit in the concept of "cash collateral" is that the purported secured creditor has an enforceable security interest in the claimed collateral. In re Wright Group, Inc., 443 B.R. 795, 805 (Bankr. N.D. Inc. 2011) (citing In re Fricks, 58 B.R. 883 (Bankr. N.D. Ala. 1986)); see also 3 Collier on Bankruptcy P 363.03 (16th 2023) ("Cash collateral also does not include cash to which the creditor's security interest has not attached or is not perfected." (footnotes omitted)).

40. A security interest in the Account Funds could have been perfected through one of three methods: (1) control of the Accounts, (2) possession of the Account Funds, or (3) identification of the Account Funds as proceeds of other collateral. None of these methods is satisfied here.

*Perfection through Control of the Accounts*

41. A security interest in the Account Funds could have been perfected by perfection of a security interest in the underlying Accounts.

42. On the Petition Date, the Account Funds were held in "deposit accounts," as that term is defined under Article 9 of the Pennsylvania Uniform Commercial Code ("UCC"): "[a] demand, time, savings, passbook or similar account maintained with a bank." See 13 Pa.C.S. § 9102(a).

43. Under UCC § 9-312, subject only to certain exceptions discussed below, "a security interest in a deposit account may be perfected only by control under section 9314 . . . ." 13 Pa.C.S. § 9312(b)(1).

44. Section 9-314 of the UCC provides that "[a] security interest in . . . deposit accounts . . . may be perfected by control of the collateral under . . . [section] 9104 (related to control of deposit accounts) . . . ." 13 Pa.C.S. § 9314(a).

9

45. Regarding control of deposit accounts, UCC § 9-104 provides:

> **(a) Requirements for control.** — A secured party has control of a deposit account if:
> **(1)** the secured party is the bank with which the deposit account is maintained;
> **(2)** the debtor, secured party and bank have agreed in an authenticated record that the bank will comply with instructions originated by the secured party directing disposition of the funds in the deposit account without further consent by the debtor; or
> **(3)** the secured party becomes the bank's customer with respect to the deposit account.

46. Neither of the Debtor's Secured Creditors has satisfied the requirements under UCC § 9-314 for control of the Debtor's depository accounts with the applicable depository institution, which is Wilmington Savings Fund Society.[7]

47. Accordingly, no creditor of the Debtor holds a perfected security interest in the Account Funds under UCC § 9-312(b)(1) through control over the Accounts.

*__Perfection through Possession of the Account Funds__*

48. An additional method of perfection by which a creditor could have secured an interest in the Account Funds was by taking possession of such funds.

49. The Account Funds are money, and "a security interest in money may be perfected only by the secured party's taking possession under section 9313." 13 Pa.C.S. § 9312(b)(3).

50. When money is held by a person other than the debtor, a secured party can take possession under UCC § 9-313(c) by having "the person in possession authenticate[] a record

---

[7] Notably, as a condition of its loan, Virage required the Debtor's to deposit all collateralized case proceeds into an account subject to a deposit account control agreement in favor of Virage. See Exhibit A § 10.2. This provision was never enforced by Virage. To the extent that Virage would now claim an enforceable security interest in the Account Funds, it has waived a right to such argument by its course of conduct. See In re Littleton, 106 B.R. 632, 636 (B.A.P. 9th Cir. 1989).

acknowledging that the person holds possession of the collateral for the secured party's benefit." 13 Pa.C.S. § 9313(c)(1).

51. The Debtor is the sole signatory to and holder of the Accounts.

52. Despite an applicable provision of the Loan Agreement, Virage has not enforced the requirement that the Debtor execute a deposit account control agreement in favor of Virage for the Accounts. See Exhibit A § 10.2.

53. Neither Secured Party has perfected an interest in the Account Funds by possession.

### *Perfection through Identification of Account Funds as Proceeds of other Collateral*

54. Lastly, a secured creditor could have held a perfected interest in the Account Funds if those funds constituted "identifiable cash proceeds" of other collateral in which the secured party held a perfected security interest. 13 Pa.C.S. §§ 9312(b), 9315(c)(d).

55. Under the UCC, "proceeds" include funds "collected on or distributed on account of collateral." See 13 Pa.C.S. § 9102(a).

56. At least initially following transmutation of collateral to proceeds, "[a] security interest in proceeds is a perfected security interest if the security interest in the original collateral was perfected." 13 Pa.C.S. § 9315(c).

57. However, the perfection afforded by UCC § 9-315(c) is generally limited to 21 days, after which the security interest will become unperfected. 13 Pa.C.S. § 9315(d) ("A perfected security interest in proceeds becomes unperfected on the 21st day after the security interest attaches to the proceeds unless [an exception] applies.").

58. Section 9-315(d) sets forth only three circumstances in which a perfected security interest in proceeds under § 9-315(c) will continue beyond 21 days:

    **(1)** The conditions set forth in all of the following subparagraphs are satisfied:
        **(i)** A filed financing statement covers the original collateral.
        **(ii)** The proceeds are collateral in which a security interest may be perfected by filing in the office in which the financing statement has been filed.
        **(iii)** The proceeds are not acquired with cash proceeds.
    **(2)** The proceeds are identifiable cash proceeds.
    **(3)** The security interest in the proceeds is perfected other than under subsection (c) when the security interest attaches to the proceeds or within 20 days thereafter.

59. Only the second of these three exceptions—§ 9-315(d)(2)—has potential applicability to the Account Funds.[8]

60. Upon information and belief, the Account Funds do not constitute "identifiable cash proceeds" of either Secured Creditor's collateral.

61. The general rule under UCC § 9-315 is that the secured party has the burden of demonstrating that proceeds are identifiable and traceable to its collateral. See 13 Pa.C.S. § 9315(b)(2); Chrysler Credit Corp. v. Superior Court, 17 Cal. App. 4th 1303, 1311 (Cal. App. 1993).

62. Where proceeds have been commingled with other funds, UCC § 9-315(b)(2) provides that a secured creditor may utilize any method of tracing that is permitted under law to identify its proceeds. 13 Pa.C.S. § 9315(b)(2).

63. The comments to UCC § 9-315 identify the "lowest intermediate balance rule" ("LIBR") as an applicable method of tracing. See 13 Pa.C.S. § 9315 (Cmt. 3); Pioneer Commer.

---

[8] The first exception at § 9315(d)(1) does not apply because the Account Funds are money, and "a security interest in money may be perfected only by the secured party's taking possession under section 9313." 13 Pa.C.S. § 9312(b)(3). Accordingly, subsection (d)(1)(ii) is not satisfied with respect to the Account Funds.

Likewise, the third exception at § 9315(d)(3) is inapplicable here. Because the Account Funds are money and no secured party perfected its interest in those funds by possession, the Account Funds fall outside the ambit of § 9315(d)(3).

Funding Corp. v. Am. Fin. Mortg. Corp., 855 A.2d 818, 824 n.13 (Pa. 2004) (citing comment 3 approvingly).

64. Simply put, LIBR assumes that proceeds deposited into a commingled account are withdrawn last and are not replenished by subsequent deposits. Accordingly, identifiable cash proceeds in a commingled account are limited to the lowest account balance since the proceeds were deposited. See Tenco Excavating v. First Sealord Sur., Inc. (In Liquidation), 78 A.3d 1181, 1186 (Pa. Commw. Ct. 2013) (applying LIBR in the context of trust funds).

65. In May 2023, the balances of the Firm's prepetition WSFS operating and payroll accounts had fallen to $17,799.70 and $2,035.99, respectively, for a total amount of $19,835.69.

66. From May 2023 to the Petition Date, in addition to rents paid to the Firm by its subtenants (none of which is collateral for either or both of the Secured Creditors), the only significant deposit into the Firm's Accounts was a May 22, 2023 deposit of $274,913.13 in funds received from the U.S. Treasury arising from the criminal diversion of funds by the Firm's former member, Scott Diamond (the "Restitution Payment").

67. The Debtor submits that neither of the Secured Creditors had a valid and perfected security interest in the Restitution Payment.

68. Accordingly, assuming the applicability of LIBR, even if the Secured Creditors' proceeds had been deposited into the Debtor's prepetition Accounts before May 22, 2023, $19,835.69 is the maximum amount of funds remaining in the Accounts on the Petition Date that *could be* identifiable cash proceeds under UCC §§ 9-315(b)(2) and (d)(1)(ii). This, the Debtor submits, is the absolute best case scenario for the Secured Parties because the Debtor receives monthly payments from subtenants, which the Debtor submits are not part of the collateral of the Secured Parties.

69. Further, it is averred that none of the $19,835.69 balance as of May 2023 constituted identifiable cash proceeds of Virage's collateral.[9]

70. Specifically, any right to claim an enforceable security interest in the Account Funds based on proceed tracing has been waived by Virage's course of conduct in failing to enforce the deposit account control requirement in the Loan Agreement.  See In re Littleton, 106 B.R. 632, 636 (B.A.P. 9th Cir. 1989).

71. Accordingly, the Debtor is entitled to a determination that the Account Funds are not "cash collateral" under 11 U.S.C. § 363(a).

### Debtor's Interim Request for Use of Cash Collateral

72. In the alternative and/or as a means of obtaining expedited authorization to use its Account Funds, the Debtor moves pursuant to 11 U.S.C. § 363(c)(2) for interim and final orders authorizing the use of cash collateral and the issuance of replacement liens.

73. The Debtor requires immediate authority to use the Account Funds to pay ongoing obligations of the Debtor's business, including the Debtor's post-petition payroll.  The Debtor projects its cash collateral needs for the period commencing on the Petition Date fro a period of thirty days or through September 25, 2023 to be $30,139.00.  A true and correct copy of the Debtor's interim monthly cash collateral budget (the "First Interim Budget") is attached hereto and made a part hereof as Exhibit "F".

74. The Court may authorize the use of cash collateral under 11 U.S.C. §§ 363(c)(2)(B) and 363(e) if the Court determines that the secured party's interest in its collateral is adequately protected.

75. The Secured Creditors' interest in the Account Funds used by the Debtor for

---

[9] The Debtor will address this issue more fully if either of the Secured Creditors attempts to satisfy their burden with respect to identifying such funds as proceeds of their collateral through tracing.

14

ordinary course transactions will be protected as follows: to the extent that the Secured Creditors have valid, perfected and non-avoidable liens in the Account Funds and the Debtor's use of the Account Funds diminishes such interest, the Debtor will grant such Secured Creditors' automatic replacement liens in the following post-petition and/or unencumbered assets of the Debtor:

    a. Monthly rents paid to the Debtor by three commercial office subtenants, in the aggregate amount of $4,750.00,[10] which the Debtor submits is an unencumbered asset and is not cash collateral to the extent identifiable as of the Petition Date or to the extent received post-petition.

    b. The value of the Debtor's fees attributable to work performed by the Firm post-petition on its current cases, in the estimated aggregate amount of in excess of $100,000 through 2023—i.e., at least over three times the amount of cash sought to be used by the Debtor.[11]

    c. All remaining assets of the Firm, to the extent not already encumbered by the PA DOS's perfected security interest.

76. Provision of replacement liens in the above post-petition and/or unencumbered assets of the Debtor satisfies the requirement of adequate protection for use of the Secured

---

[10] The amount of such subtenant rents collected through the Petition Date in 2023 is $40,500.00.

[11] If earned prepetition, such fees could have been encumbered by prepetition liens. However, 11 U.S.C. § 552 prevents any prepetition liens from encumbering the Firm's fees earned postpetition. See 5 Collier on Bankruptcy P 552.02[2] (16th 2023) (explaining that prepetition liens may attach only to proceeds "directly attributable to prepetition collateral"—not to the fruits of a debtor's postpetition labor); c.f. ACF 2006 Corp. v. Conour, 2015 U.S. Dist. LEXIS 10942, at *15-24, 2015 WL 417553 (S.D. Ind. Jan. 30, 2015) (limiting secured creditor's interest in an attorney's contingency fee to "quantum meruit recovery for the reasonable value of the services rendered" prior to transition of the case to a new firm). Any fees earned by the Firm postpetition are therefore not subject to any creditor's prepetition lien.

The Firm estimates that through the remainder of 2023, based solely on the cases it currently has and subject to increase based on any additional cases received, it will generate 150 hours of attorney work billable under a loadstar methodology at $850.00 per hour.

Creditors' alleged cash collateral under 11 U.S.C. § 361(2). The value of the replacement liens is more than sufficient to compensate the Secured Creditors for the monthly decrease of the value of their alleged interests in the Account Funds.

77. The Debtor believes that the equities favor permitting the use of the Account Funds. If the use of Account Funds is denied, the Firm will, in all probability, be forced to cease operations immediately, causing the Firm to forego ongoing representation in its cases and thereby diminishing the value of the Firm's primary assets—i.e., its case files—and undermining the likelihood and degree of recovery that the Firm's creditors, including the Secured Creditors, can expect to receive.

78. It is in the best interests of the Debtor and its estate to authorize the use of Account Funds immediately so that the Debtor may continue its operations, including meeting its payroll obligations and business needs on a current basis, and advance its chapter 11 case.

### Expedited Consideration of the Motion is Necessary to Prevent Immediate and Irreparable Harm

79. The Debtor requests that the Court conduct an expedited preliminary hearing with respect to this Motion and schedule a final hearing at the earliest possible date in accordance with Fed.R.Bankr.P. 4001(b).

80. Under Rule 4001 of the Bankruptcy Rules, a final hearing on a debtor's motion to authorize use of cash collateral may not be commenced earlier than 14 days after service of the motion. Fed.R.Bankr.P. 4001(b)(2). Upon request, however, the Court may conduct a preliminary, expedited hearing on such a motion and authorize the use of cash collateral to the extent necessary to avoid immediate and irreparable harm to the debtor's estate. Fed.R.Bankr.P. 4001(b)(2).

81. As noted above, the Debtor has an urgent and immediate need to use its Account

Funds to continue operating its Firm. As reflected on the First Interim Budget, without immediate access to the Account Funds—which is the sole present source of funding for the Debtor's operations—the Debtor cannot pay current and ongoing operating expenses such as its employee's salary, rent, and the costs of other necessary services. Consequently, the use of Account Funds on an immediate and interim basis is required to avoid irreparable harm that will jeopardize the Firm's operations and value, and will further jeopardize the recovery that creditors can expect to receive.

82. In order to avoid immediate and irreparable harm to the Debtor pending a final hearing on this Motion, the Debtor requires the use of the Account Funds in accordance with its First Interim Budget.

83. Pursuant to Local Bankruptcy Rule 5070-1(g), the Debtor, through its proposed counsel, notified the Secured Creditors and the Office of the United States Trustee of the within Motion and the Debtor's intention to seek expedited consideration thereof.

**Notice**

84. If this Court grants the Debtor's request for an expedited hearing, the Debtor is prepared to serve by email, facsimile or overnight mail any such Order, this Motion and proposed Order granting the interim relief sought under the Motion to (i) the Office of the United States Trustee; (ii) the Secured Creditors; and (iii) the Debtor's twenty largest unsecured creditors. In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is required.

85. No previous request for the relief sought herein has been made to this Court or any other court.

WHEREFORE, the Debtor respectfully requests that this Court enter interim and final

orders, substantially in the form annexed hereto, orders (i) determining that certain funds are not cash collateral; (ii) authorizing the Debtor to use alleged cash collateral and granting provisional adequate protection to the Debtor's pre-petition secured creditors; (iii) scheduling an expedited hearing on the relief requested herein; (iv) scheduling a further hearing on this Motion; and (vi) granting such other and further relief as is just and proper under the circumstances.

SMITH KANE HOLMAN, LLC

Date: September 7, 2023

By: */s/ Nicholas M. Engel*
Nicholas M. Engel, Esquire
David B. Smith, Esquire
112 Moores Road, Suite 300
Malvern, PA 19355
(610) 407-7215 Phone
(610) 407-7218 Fax
*Proposed counsel to the Debtor*