**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | Civil Action No.: 23-12540-pmm |
| | : | |
| Sacks Weston, LLC | : | Chapter 11 |
| Debtor. | : | |

_____

**OBJECTIONS TO DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS**
**(I) DETERMINING THAT CERTAIN FUNDS ARE NOT CASH COLLATERAL;**
**(II) TO THE EXTENT THERE IS CASH COLLATERAL, AUTHORIZING USE**
**THEREOF AND GRANTING PROVISIONAL ADEQUATE PROTECTION;**
**(III) EXPEDITED HEARING; AND**
**(IV) GRANTING RELATED RELIEF (THE "MOTION")**

## I.    INTRODUCTION

Virage SPV I LLC ("Virage") is a Houston, Texas lender that helps lawyers finance cases against well-funded opponents. Sacks Weston LLC ("Debtor") entered into the June 5, 2017 Loan Agreement with Virage—with a balance now over $14.1 million—secured by Debtor's accounts receivable from fee interests, referral fees, and reimbursed expenses on **100%** of Debtor's hourly and contingent cases. Debtor's owners—Sacks & Weston P.C., Andrew Sacks, and John Weston (the "Non-Debtors")—personally guaranteed this debt. When the loan became due in June 2021, Virage explored solutions with Debtor, including payment plans, refinance options from other lenders, and pledges of personal assets. But Debtor refused all reasonable options. Debtor and Non-Debtors then revealed that they converted and wasted over $3 million of collateral and that, to prevent collection on his personal guarantee, Sacks fraudulently transferred $7.1 million of personal assets into tenancies by the entireties. Sacks himself recently made clear, "I'm not writing you a check for $14,000,000 today. I don't think I ever will." Ex. 1, Sacks Dep. at 20:8-9.

1

Virage filed suit in Houston, Texas on March, 24 2023 for breach of contract, fraudulent transfer, and declaratory judgment (the "Texas Case"). After discovery began, in July 2023, Sacks launched an effort to sell Debtor's fee interest in Philadelphia's opioid litigation (the "Opioid Cases"), which Sacks admits are Debtor's only remaining valuable cases. Ex. 2, Sacks Text Messages; Ex. 11; Ex. 1 at 106:19-21, 127:4-7.  Sacks bragged in text messages to a broker, Rita Reynolds, that he would delay the Texas trial for "4 years." Ex. 2. When confronted that he could not sell Virage's collateral with the Texas Case pending, Sacks responded "[t]he hell I can't" and "[f]uck them." *Id.* Sacks threatened Ms. Reynolds to "say zero to those lying bastards." *Id.*



In response, on July 31, 2023, Virage obtained a temporary restraining order (the "TRO") that: (1) found Debtor and Non-Debtors breached the Loan Agreement; (2) found Sacks fraudulently transferred personal assets into tenancies by entireties and found Debtor attempted to fraudulently transfer the Opioid Cases; (3) found Debtor and Non-Debtors insolvent; and (4) prohibited Debtor and Non-Debtors from transferring collateral, required them to provide reporting about the identity and value of the collateral, and required them to deposit **100% of any collateral proceeds**—including the May 2023 $274,913.13 restitution payment from Scott

Diamond (the "Restitution Payment")—into the Texas court's registry. Ex. 3, TRO. **Debtor and Non-Debtors then refused to comply with the TRO.**

After conducting expedited discovery including Sacks's and Weston's depositions and the review of thousands of documents, on August 11, 2023, the Texas court heard five hours of live evidence on Virage's request for a temporary injunction, including four witnesses, two experts who opined that Debtor and Non-Debtors have been insolvent since 2017, deposition designations, 100+ exhibits, and post-hearing briefing. On August 18, 2023, the Texas court entered the "Temporary Injunction" or "TI," essentially repeating the findings from the TRO and entering the same relief, with the change that Debtor was only required to deposit 60% of collateral proceeds into the court's registry instead of 100%. Ex. 4, TI. To avoid any doubt, the Temporary Injunction specifies that the Restitution Payment is "proceeds of Collateral":

> 6.  Virage demonstrated it has an attached, perfected, first-priority security interest in the "Collateral," which is any attorney's fees, expenses, or other financial recoveries that the Firm is or may become entitled to in connection with the litigation matters identified as the "Eligible Cases" and "Eligible Collateral Cases" in the Loan Agreement. The "Eligible Cases" are the specific cases listed in Schedule 1.1 of the Loan Agreement. The "Eligible Collateral Cases" are the litigation matters identified in Schedule 1.2 of the Loan Agreement and all the Firm's cases or claims in which the Firm has been retained, is subsequently retained, or otherwise has a legal interest. The Collateral includes Defendants' opioid cases. The Collateral also includes proceeds of restitution payments received from Defendant Diamond for theft of proceeds of Collateral.

**Debtor and Non-Debtors then refused to comply with the Temporary Injunction.**
Instead, they began procedural maneuvering. On August 20, 2023, they appealed for an emergency stay of the Temporary Injunction. Within 20 minutes of Virage filing its response, Debtor filed its Chapter 11 petition. They then filed suggestions of bankruptcy in Texas **incorrectly** asserting that the petition stayed proceedings against Debtor **and** Non-Debtors. *See McCartney v. Integra Nat'l Bank N.*, 106 F.3d 506, 509-10 (3d Cir.1997) (bankruptcy stay does **not** apply to claims against non-debtor guarantors, owners, or co-defendants); *Dominic's Rest. of Dayton, Inc. v. Mantia*, 683 F.3d 757, 76-61 (6th Cir. 2012) (bankruptcy stay does **not** prevent enforcement of prior-issued

injunctions). Virage informed them of this misstatement and attempted to confer regarding severing the Texas case against Non-Debtors. Debtor's bankruptcy counsel asked for more time to respond but ensured Virage that Debtor would not spend cash collateral and cited **no** exigent need for cash collateral. Ex. 22 at 2. Weston then used the extension Virage gave them to personally attempt to remove the Texas Case to federal court.

Debtor also used the extension to file the Motion, which incorrectly claims that Debtor's cash is not cash collateral, and that, even if it is, Debtor can provide adequate protection to spend the cash collateral through replacement liens. Virage objects to the Motion, which fails because:

1. Virage's perfected security interest is in "accounts"—not "deposit accounts"—and "proceeds" of accounts, which Sacks admits includes 100% of the funds in Debtor's three WSFS deposit accounts and 100% of the Restitution Payment.

2. Debtor does not attempt to value the collateral or Virage's interest in the collateral.

3. Debtor does not disclose that Virage's interest is undersecured and at risk.

4. The replacement liens Debtor offers are inadequate because Debtor reports the assets offered are worth $0.00 or offers assets in which Virage already has a security interest.

5. Debtor presents no business plan for positive cash flow or reorganization because Debtor has no chance of reorganization.

6. Debtor faces no immediate or irreparable harm. Non-Debtors have millions in liquid assets to finance Debtor's alleged short-term expenses. Also, the alleged expenses will not generate revenue or protect the collateral because they are unrelated to any case expenses.

7. Debtor's pre-petition misconduct and spending of the collateral and disregard for two court orders weigh in favor of denying the Motion.

## II.    BACKGROUND

### A.  Virage loaned millions to Debtor and obtained a perfected security interest.

On June 5, 2017, Virage, Debtor, and Non-Debtors executed the Loan Agreement with Virage as lender, the Firm as "Borrower," and Sacks, Weston, Diamond, Sacks & Weston P.C., and Diamond Law P.C. as unconditional, jointly and severally liable "Guarantors." Ex. 5 at

VCM_SW0000895-896, 908, 919. Virage agreed to amend and replace prior loans and advance new funds. *Id.* The new principal was $5,794,960.92. *Id.* With interest and expenses, as of July 31, 2023, the balance was $14,127,942.40. Ex. 6.

Virage's security interest attached upon: (a) Virage's payment of the old principal and new advance; (b) the parties executing the loan documents, which describe the collateral; and (c) Debtor obtaining rights in the collateral. *See* Tex. Bus. & Com. Code § 9.203(a); Ex. 5 § 11(b) (Texas law applies); *In re Fineberg*, 202 B.R. 206, 218-19 (Bankr. E.D. Pa. 1996) (applying contractual choice-of-law provision). Virage perfected and maintained the perfection of its security interest by filing a UCC-1 financing statement and a UCC continuation statement. Ex. 7; Ex. 8.

### B. Virage's collateral includes the Restitution Payment and Virage's remaining collateral is probably worth substantially less than the debt.

Virage does **not** claim a security interest in Debtor's three WSFS bank accounts ending 3506, 9208, and 6630 (the "WSFS Deposit Accounts") as "**deposit accounts**" under the U.C.C. Mot. at 6-14; Doc 15 at 3. Instead, under the U.C.C., Virage's "Collateral" includes all Debtor's "**accounts**" that are accounts receivable for fee interests, referral fees, or reimbursed expenses for any hourly or contingent case in which Debtor has or will have an interest as counsel.

Specifically, under the Security Agreement, Virage's "Collateral" includes "Accounts," and "Proceeds" on "any Eligible Case or Eligible Collateral Case," "whether now owned or existing or hereafter created." Ex. 25 § 1. Under the Loan Agreement, Virage has a security interest "in all of the Case Proceeds of all Eligible Cases and Eligible Collateral Cases whether now owned or hereafter acquired." Ex. 5 § 10.1. "Eligible Cases" are the cases listed on Schedule 1.1. *Id.* at VCM_SW0000892. "Eligible Collateral Cases" are "all" other—**100%**—"of Borrower's cases or claims in which the Borrower has been retained or is subsequently retained as legal counsel." *Id.* "Case Proceeds" are "proceeds" of any kind, including "amounts received on account of fees and

5

expenses" **and** "recoveries" by "lawsuit, settlement, or otherwise" against "attorneys . . . directors, officers, or other related parties." *Id.* at VCM_SW0000891.

Therefore, Virage's Collateral includes Case Proceeds such as the Restitution Payment from Diamond. In fact, in his deposition, Sacks admitted that: (1) as of August 4, 2023, the WSFS Deposit Accounts, jointly contained "$172,843.50"; (2) 100% of this $172,843.50 is from the $274,913.13 Restitution Payment, which is all Debtor is "living off"; and (3) this Restitution Payment is 100% "case proceeds" that Diamond stole:

```
17        Q.  Okay.  Okay.  Make sure we are not talking
18    past each other.
19             I'm asking you just of the $172,843.50,
20    all of that came from Scott Diamond's restitution
21    payment.
22             Is that what you're saying?
23        A.  Yep.
```

```
18        Q.  Okay.  So what is the money in the bank for
19    Sacks Weston LLC from?
20        A.  What money?
21        Q.  There was $172,000 --
22        A.  Oh, oh, oh.  You mean what money now?
23        Q.  Yeah.
24        A.  When Scott went to jail, he -- we waited a
25    month and a half, and got some retribut- -- some
```

```
                                        Page 120
1     restitution.
2        Q.  Okay.  So the only money --
3        A.  So we've been living off restitution.
4        Q.  Okay.  And that restitution was for case
5     proceeds that Scott -- that Scott Diamond had taken from
6     the firm, correct?
7        A.  Oh, yeah.
```

Ex. 1 at 123:17-23, 119:18-120:7; Ex. 21.

Based on these records and admissions, from May 2023 to August 4, 2023, Debtor thus spent $102,069.63 of this $274,913.13 Restitution Payment. From August 4, 2023 to now, Debtor spent another $57,100.58, leaving only $115,742.92. Doc. 15 at 2. Debtor has thus spent **58%** of the Restitution Payment in violation of the TRO and the Temporary Injunction.

### C.  Debtor and Non-Debtors breached the Loan Agreement.

The Texas court found, and Debtor and Non-Debtors essentially conceded, that they breached their obligations under the Loan Agreement by:

- Failing to pay to Virage 60% of Case Proceeds before default, failing to pay to Virage 100% of Case Proceeds after default, and converting over $3 million in Case Proceeds as a result of withholding and wasting these unpaid Case Proceeds.

- Failing to pay the loan in full on or before the Maturity Date of June 26, 2021;

- Failing to provide complete reporting under Section 7.3 of the Loan Agreement, which requires reporting on the value of the collateral, the identity and status of each case, and any material changes in Debtor's or Non-Debtors' assets;

- Diamond leaving the Firm; and

- Attempting to sell the Opioid Cases without Virage's authorization.

Ex. 4 ¶ 9; Ex. 5, VCM_SW0000905, 896 (default by nonpayment by Maturity Date and breach of mandatory 60% and 100% prepayment obligations); 903, 894 (default by noncompliant collateral reports and failure to report Sacks's "Material Adverse Effect" of transferring his primary assets); 906, 891 (default by Diamond leaving the Firm); 905 (default by attempting to sell the Opioid Cases); Ex. 9, Summary of Payments; Ex. 10, Temp. Inj. Tr. at 45:4-73:9 (testimony regarding these breaches), 234:21-235:23 (Court's acknowledgement of fraudulent transfers and non-reporting), 242:25-243:5 (counsel for Debtor conceding Debtor's several breaches).

Now, the **only** identified Collateral proceeds left are: (1) the cash remaining from the Restitution Payment, and (2) future fees on Opioid Cases, which may pay $200,000 by June 2024 and may pay up to $1 million by 2033. Ex. 11; Ex. 2; Ex. 1 at 106:19-21, 127:4-7.

### D.  Debtor and Sacks engaged in fraudulent transfers.

As the Texas court found, for "token" consideration, Sacks fraudulently transferred a $4 million "Primary Residence" and $3.1 million "Morgan Stanley Margin Account" into tenancies

by entireties to hinder, delay, or defraud Virage. Ex. 12; Ex. 13; Ex. 1 at 35:13-36:04, 36:09-21, 38:24-39:08, 46:19-47:09, 48:22-49:22, 55:3-5; *Garden State Standardbred Sales Co. v. Seese*, 417 Pa. Super. 15, 23 (1992) ("when a spouse conveys individual property to a tenancy by the entireties in fraud of creditors, the creditor may nevertheless execute against the property"); Ex. 4 ¶ 9. In another breach, Sacks concealed these transfers. Ex. 5 at VCM_SW0000894, 903. The transfers happened during the Loan Agreement and its immediate predecessor. Debtor and Non-Debtors were insolvent at the time of both transfers. Ex. 4 ¶¶ 12-13; *infra* § II(E).

In July 2023, Sacks also fraudulently attempted to sell Debtor's interest in the Opioid Cases. Sacks texted broker Rita Reynolds about buyers for a "10 and 5 year buy out of opioid fees" on a "City" case. Ex. 2. Sacks admitted that these fees were "[a]round $1 Mil. But over 5, 10 years." *Id.* When she refused to buy, he cussed and threatened her and Virage, and said he would use the Texas legal system to delay trial "4 years." *Id.* Sacks also attempted to sell this interest to three other buyers. Ex. 14; Ex. 23; Ex. 24. When challenged by one buyer that there are "outstanding liens and litigations" that require a "collateral release" for any sale, Sacks denied Virage's collateral interest and said that he would simply "find another group for my team" to sell to. Ex. 14 at 1-2. It is uncontroverted that any such sale would be for pennies on the dollar because of Virage's security interest. Ex. 10 at 66:19-67:11. The Texas court found thus found that Debtor and Non-Debtors "attempted to transfer or sell rights to the Collateral." Ex. 4 ¶ 13.

### E.  Debtor and Non-Debtors are insolvent, have no plan for reorganization, and face no immediate or irreparable harm.

Multiple experts confirmed that Debtor and Non-Debtors are each insolvent because their liabilities each exceed their assets by millions of dollars and because they cannot pay their debts as they become due:

**Summary of Net Worth Equity**

| | Sacks Weston LLC August 4, 2023[1] | Andrew Sacks (JT) August 6, 2023[1] | Andrew Sacks (AS) August 6, 2023[3] | John Weston July 2023[3] | Sacks & Weston S. Corp July 2023[3] |
|---|---|---|---|---|---|
| Assets | $ 515,230.10 | $ 9,305,000.00 | $ 5,800,000.00 | NA | NA |
| Liabilities | (5,381,387.23) | (3,930,000.00) | (3,930,000.00) | NA | NA |
| Total Net Worth/Equity per Balance Sheet/Personal Financial Statement | $ (4,866,157.13) | $ 5,375,000.00 | $ 1,870,000.00 | $ 3,256,793.52 | $ (4,866,157.13) |
| Virage Note Payable[4] | (9,590,092.31) | NA | NA | NA | NA |
| Guaranty on Virage Debt[4,5] | NA | (13,918,899.31) | (13,918,899.31) | (13,918,899.31) | (9,590,092.31) |
| Total Net Worth/Equity | $ (14,456,249.44) | $ (8,543,899.31) | $ (12,048,899.31) | $ (10,662,105.79) | $ (14,456,249.44) |

Ex. 15. The testimony also proved Debtor and Non-Debtors have been insolvent since 2017. Ex. 10 at 68:13-20, 83:5-87:19, 130:24-133:12. As of 2021, Sacks said Debtor would not survive long based on his health, Debtor's finances, and Weston's age. Ex. 16.

Despite Debtor's insolvency, Sacks and Weston refuse to work and refuse to contribute capital to Debtor. Debtor thus has no prospect of positive cash flow. Specifically, Sacks has done no legal work since **1986**, and Weston will soon **retire**. Ex. 17, Weston Dep. at 16:25-17:12, 15:14-16:20. Debtor also has not had enough cash flow to make a payment to Virage since July 28, 2020. Ex. 9. Sacks admits Debtor "would have been out of business years ago if" Debtor paid "60%" of Case Proceeds to Virage. Ex. 18. Instead, Debtor converted and wasted $3,061,562.06 that Debtor should have paid to Virage as part of its mandatory payments of Case Proceeds. Ex. 9. Similarly, Debtor spent **59%** of the Restitution Payment. Doc 15 at 2. None of this waste of the Collateral has resulted in **any** positive cash flow.

Despite its insolvency, Debtor faces no immediate or irreparable harm because Debtor has access to financing from Sacks and Weston. Sacks has $9,305,000 in assets, including $700,000 in cash and $3.1 million in other liquid assets. Ex. 12. Weston has over $3 million in assets, $2.5 million of which are liquid. Ex. 19. The reason Sacks does not use his wealth to pay Debtor's expenses is because he wants to live like a millionaire and have cushion to pay for luxury personal expenses, like the mortgage on his $4 million Primary Residence. Ex. 1 at 131:8-20, 130:5-8; Ex.

12. As he admitted, "what he spent millions on in [his] 40s would probably make you cringe. When I was young I grew up on a TV series called 'lifestyles of the rich and the famous.' Let us just say I enjoyed my 40's too much." Ex. 20.

Debtor's assertion that, without the cash collateral, it may lose its interest in cases or cease operations is baseless. Debtor presents no evidence it is at risk of losing a single existing case. Not one penny of Debtor's budget is for case expenses like court reporters or experts. Doc 18-8. Debtor has one employee, an office administrator, who does no legal work. Ex. 17 at 14:10-14. Debtor has only two lawyers, Sacks and Weston, who are not on the payroll and who will not generate revenue on new, post-petition accounts. Ex. 17 at 16:25-17:12, 15:14-16:20. Debtor does not need a $16,000 monthly lease when Debtor does no legal work. Doc 18-8. As for operational risk, Debtor already has $58,000 in "Rent Arrears" that have not affected operations. Doc 15 at 12.

Finally, Debtor's expected expenses in the next nine months are $350,000. Ex. 1 at 128:18-21. So, even if Debtor spends 100% of the remaining $115,742.02 Restitution Payment and 100% of the $200,000 in fees that **might** come in on Opioid Cases by June 2024, Debtor cannot cover the specified expenses, which are unrelated to working or servicing any cases. Accordingly, approving Debtor's budget to spend cash collateral is futile.

### III. ARGUMENT

Virage objects to, and the Court should deny, the Motion for two reasons. First, 100% of the cash in the WSFS Deposit Accounts is cash collateral. Second, Debtor has not met its burden to provide adequate protection for use of the cash collateral.

### A. All of the cash in the WSFS Deposit Accounts is cash collateral.

Debtor's argument that the cash in the WSFS Deposit Accounts is not cash collateral is wrong on each point. First, under the U.C.C., the underlying Collateral for the Loan Agreement is

10

"accounts." Specifically, Virage's security interest in Debtor's "Case Proceeds" is on "accounts" from fee interests, referral fees, reimbursed expenses, and "proceeds" thereof. *Supra* § II(B). The Collateral is thus "accounts" under the U.C.C. because it is "right[s] to payment of a monetary obligation . . . for services rendered or to be rendered." Tex. Bus. & Com. Code § 9.102(a)(2)(ii). Virage perfected its security interest in these accounts by filing financing statements. *See id.* § 9.310(a); Ex. 7; Ex. 8; *supra* II(A)-(B).

Second, by contrast, Virage's security interest is **not** in the WSFS Deposit Accounts per se, which are "deposit accounts" under the U.C.C. because they are "demand, time, savings, passbook or similar account[s] maintained with a bank." Tex. Bus. & Com. Code § 9.102(a)(2)(ii). Because Virage does **not** claim a security interest in the WSFS Deposit Accounts themselves (as opposed to the **proceeds** therein), Debtor's discussion of whether Virage has a perfected security interest in a deposit account is inapposite and incorrect. Mot. at 8-11.

Third, Debtor is incorrect that the cash in the WSFS Deposit Accounts is not Virage's Collateral. In his deposition, Sacks swore that: (1) as of August 4, 2023, the WSFS Deposit Accounts jointly contained "$172,843.50"; (2) 100% of this $172,843.50 is from the $274,913.13 Restitution Payment, which is all Debtor is "living off"; and (3) this Restitution Payment is 100% "case proceeds" under the Loan Agreement. *Supra* § II(B); Ex. 1 at 123:17-23, 119:18-120:7; Ex. 21. This cash is thus "proceeds" under the U.C.C. *See* Tex. Bus. & Com. Code § 9.102(a)(65).

Fourth, because Sacks admits the cash in the WSFS Deposit Accounts is 100% Restitution Payment and 100% Case Proceeds, this cash is "identifiable proceeds of collateral" to which Virage's security interest automatically attaches. *Id.* § 9.315(a)(2). Because these proceeds were not "commingled with other property," no "tracing" analysis is appropriate or required and the Lowest Intermediate Balance Rule ("LIBR") is inapplicable. *Id.* § 9.315(a)-(b).

Fifth, Debtor's assertion that the LIBR, even if it applied, automatically limits Virage's security interest is wrong. A creditor's security interest in commingled cash proceeds applies "to the extent that the secured party identifies the proceeds by a method of tracing, including application of equitable principles, that is permitted under law other than this chapter with respect to commingled property of the type involved." *Id.* § 9.315(b)(2). Although the LIBR is one such method, it is not exclusive. Here, it simply does not apply because Virage and Sacks have 100% identified these cash proceeds.

Sixth, Virage's security interest in these "proceeds" remains "perfected" because Virage's "interest in the original [accounts] collateral was perfected." *Id.* § 9.315(c). Virage's security interest did not become unperfected after 21 days because: (1) "a filed financing statement covers the original [accounts] collateral," **and** (2) the Restitution Payment proceeds in the WSFS Deposit Accounts are 100% "identifiable cash proceeds" that have not been commingled with other funds. *Id.* § 9.315(d)(1)(A), (2).

Seventh, even if Virage claimed a security interest in a deposit account—which it does not—Debtor is wrong regarding waiver, *In re Littleton* and Section 10.2 of the Loan Agreement. *In re Littleton* concerned whether a bankruptcy court properly determined that a debtor's use of cash proceeds was intentional misconduct. 942 F.2d 551, 553 (9th Cir. 1991). Under that agreement, "the cash proceeds from each sale **would** be held in a segregated account." *Id.* at 552 (emphasis added). Because the creditor never enforced this **mandatory** provision, the court affirmed that the debtor's failure to comply was not intentional misconduct. *Id.* at 556. Contrary to Debtor's misstatement of *In re Littleton*, that court did **not** hold that the creditor waived the security interest. Mot. at 10 n.7, 14. Also, Debtor misstates that "Virage **required** the Debtor's [sic] to deposit all collateralized case proceeds into an account subject to a deposit account control

agreement." *Id.* (emphasis added). Rather, Virage had the **option** to "request[]" deposits into a control account. Ex. 5 § 10.2. Thus, even if the failure to enforce a **mandatory** deposit account provision could waive a security interest—which it cannot—there was no such failure here.

For these reasons, the cash in the WSFS Deposit Accounts is 100% proceeds of Virage's Collateral and thus is "cash collateral." *See* 11 U.S.C. 363(a).

### B. Debtor has not met its burden to provide adequate protection.

Debtor cannot use the cash collateral because Debtor has not met its burden to provide adequate protection for Virage's interest in the cash collateral. *See* 11 U.S.C. §§ 363(c)(2), (e), (p)(2). To meet this burden, Debtor must: (1) "establish the value of the secured creditor's interest"; (2) "identify risk to the secured creditor's value resulting from the debtor's request for use of cash collateral"; (3) "determine whether the debtor's adequate protection proposal protects value as nearly as possible against risks to that value consistent with the concept of indubitable equivalence"; (4) present some "realistic prospect of reorganization"  because, "[i]f a debtor is engaged in an obviously futile attempt to reorganize, it should not be permitted to jeopardize a creditor's cash collateral"; and (5) present evidence that Debtor will suffer immediate and irreparable harm. *In re GVM, Inc.*, 605 B.R. 315, 325 (Bankr. M.D. Pa. 2019); *In re LightStyles, Ltd.*, No. 1:12-bk-03711, 2012 WL 3115902, at *2-4 (Bankr. M.D. Pa. July 27, 2012); Fed. R. Bankr. P. 4001(b)(2). Based on these factors, Debtor does not meet its burden.

### 1. Debtor has not identified or valued Virage's claim.

Debtor did not attempt, formally or informally, to establish the value of Virage's claim, the Collateral, or Virage's interest in the Collateral. Mot. at 14-17. Instead, Debtor values all its assets besides the cash collateral at "$0.00," and claims to have "[n]o" "accounts receivable. Doc. 15 at 3-8. Debtor also prevented Virage from valuing its own claim because Debtor refuses to identify

each case, its value, and its status as required by the Loan Agreement, TRO, and Temporary Injunction. Ex. 5 § 7.3(d)(iv), (a); Ex. 3; Ex. 4. This misstep is crucial because, if Virage is oversecured, Virage is entitled to the full value of this claim. *In re GVM, Inc.*, 605 B.R. at 325-27. If Virage is undersecured, Virage's claim is limited to the value of the Collateral. *Id.*

That said, with the incomplete information known to date, Virage is likely **undersecured** by millions. Specifically, as of July 31, 2023, Virage's claim was $14,127,942.40. Ex. 9. The cash collateral is now $115,742.92. Doc 15 at 2. The only other Collateral with identified value is Debtor's fee interest in the Opioid Cases, which might pay $200,000 between now and June 2024 and might pay up to $1 million by 2033. Ex. 11; Ex. 2; Ex. 1 at 106:19-21, 127:4-7.

**2. The risk to Virage's interest is high because Virage is undersecured.**

Debtor does not address the risk to Virage's interest from use of the cash collateral. Here, the risk to Virage from Debtor's continued use of the cash is high because Virage "is undersecured and any diminution in the value of the collateral will result in a loss to [Virage] unless its interests are adequately protected." *See In re LightStyles, Ltd.*, 2012 WL 3115902, at *3; *In re GVM, Inc.*, 605 B.R. at 326-27 (noting that the existence of an "equity cushion" for an oversecured creditor is essential to the analysis of this factor).

**3. Debtor's proposed replacement liens do not provide adequate protection.**

Because Virage is "undercollateralized by a large amount, the court must be more particular concerning the adequacy of protection offered." *See In re Phila. Consumer Disc. Co.*, 37 B.R. 946, 949-50 (E.D. Pa. 1984). Here, Debtor cannot establish adequate protection because each dollar spent of the cash collateral causes a decrease in Virage's property interest. *See id.* (to provide adequate protection, the value of the "creditor's property interest . . . may not be diminished"). The only alleged adequate protection Debtor offers are "replacement lien[s]." 11

14

U.S.C. § 361(2); Mot. at 15-16. Here, the protection is inadequate because Debtor offers liens on assets with "$0.00" in value or assets in which Virage already has a security interest.

First, a replacement lien on "[a]ll other assets of the Firm" is worthless. Mot. at 15. Debtor values all assets besides the cash collateral at "$0.00." Doc. 15 at 3-8. Debtor says it has "[n]o" "accounts receivable." *Id.* at 3-4. Debtor even values assets like "office furniture," "[c]omputer software and computers, "artwork," and improvements to the leasehold at "$0.00." *Id.* at 3-6.

Second, Debtor then contradicts itself, claims to have at least one unspecified account receivable, and offers a lien on "the value of the Debtor's fees attributable to work performed by the Firm post-petition on its current cases, in the estimated aggregate amount of in excess of $100,000 through 2023." Mot. at 15. Debtor's factual representations about unspecified case earnings of $100,000 are incorrect and inconsistent because:

- Virage already has a security interest in all fees on all accounts receivable for all current cases and accounts, which all existed pre-petition. *Supra* § II(B). Despite two court orders to identify all cases, Debtor now identifies no cases for which Debtor has become counsel since filing the petition.

- Sacks admitted the only cases of value left are the Opioid Cases, in which Virage already has a security interest and which will pay at best $200,000 by June 2024 and up to $1 million by 2033. Ex. 11; Ex. 2; Ex. 1 at 106:19-21, 127:4-7.

- Debtor disclosed zero accounts and said all such assets are worth $0.00. Doc. 15 at 3-8.

- Debtor describes all its cases as "contingency fee based," and Debtor discloses no new hourly cases that might constitute new, post-petition accounts. *Id.* at 7.

- As Weston admits, Sacks has done no legal work since 1986 and Weston plans to retire soon. Ex. 17 at 16:25-17:12, 15:14-16:20. They are not taking new cases.

Because any payments from existing cases would be "made from pre-petition accounts receivable," "no additional protection to [Virage] is being afforded." *In re LightStyles, Ltd.*, 2012 WL 3115902, at *3. Debtor simply attempts to conflate cash received on **pre-petition accounts** with potential cash on new, **post-petition accounts** that simply do not exist.

Finally, Debtor offers alleged rents of $4,750 from three commercial subtenants. Mot. at 15. But Debtor disclosed that these fees are not "rents" but are fees for "various co-counsel contracts" for which Debtor refuses to disclose specifics. Doc 15 at 17. Fees on co-counsel contracts are **pre-petition accounts** that are Virage's Collateral. *Supra* § II(B). In any event, $4,750 in rent fees does not provide adequate, equal protection for the requested $30,139 budget.

### 4. Debtor offers no business plan, and any reorganization plan is futile.

Debtor should not be able to use the cash collateral because Debtor has no reasonable chance of reorganization and is engaged in an obviously futile attempt to reorganize.

First, Debtor offers no business plan and no evidence regarding potential short-term positive cash flow. *See In re LightStyles, Ltd.*, 2012 WL 3115902, at *3-4 (denying use of cash collateral for "thirty days" in part because the reorganization plan's proposal for swinging from a large loss to a profit was too speculative). Cases that approve use of cash collateral typically involve some proof of documented positive cash flow (however recent), an equity cushion, cash payments to the secured creditor, and replacement liens on assets of actual value. *See In re GVM*, 605 B.R. at 328-31. Here, Debtor does not even speculate that it can prove any of these factors. Instead, the following uncontroverted facts all weigh against a finding that Debtor has a reasonable chance of developing positive cash flow or a successful reorganization plan:

- Debtor provides no plan. *See* Mot. at 14-17.

- Sacks does no legal work, has done no legal work since 1986, and will generate no post-petition legal work. Ex. 17 at 16:25-17:12.

- Weston is the only lawyer who occasionally performs legal work, plans to retire soon, and will generate no post-petition legal work. *Id.* at 15:14-16:20.

- No case expenses identified in the proposed budget relate to generating revenue on cases. Doc 18-8. Each dollar spent will not generate revenue but will simply pay rent for an office in which zero legal work is likely to occur.

- Sacks projects $350,000 in expenses between now and June 2024. Ex. 1 at 128:18-21. The only current cash is the $115,742.92 left from the Restitution Payment and the only potential cash is the $200,000 that the Opioid Cases (which are Collateral) may pay by June 2024. Doc 15 at 2; Ex. 11; Ex. 2; Ex. 1 at 106:19-21, 127:4-7. Therefore, even if Debtor spends 100% of the cash collateral, Debtor will not cover projected expenses.

- Sacks admits the only plan is to "liv[e] off" the Restitution Payment until more funds come in from the Opioid Cases. Ex. 1 at 123:17-23, 119:18-120:7.

- Debtor and Non-Debtors are insolvent and have been since 2017. Ex. 15; Ex. 10 at 68:13-20, 83:5-87:19, 130:24-133:12.

- Debtor values its assets at $0.00 apart from the Restitution Payment and identifies no accounts receivable. Doc 15 at 3-8.

- Debtor already converted and wasted $3 million in Case Proceeds and 59% of the Restitution Payment. Debtor has only massive losses to show for it. Ex. 9; Doc 15 at 2.

- Debtor would have been out of business years ago but for this conversion. Ex. 16; Ex. 18.

- Debtor has not paid one penny to Virage since July 28, 2020. Ex. 9.

- Sacks and Weston are millionaires but refuse to contribute one penny more to Debtor. Ex. 12; Ex. 19; Ex. 20.

Based on these prospects, there is no chance of a successful reorganization. Any use of cash collateral would be an impermissible gamble. *See In re LightStyles, Ltd.*, 2012 WL 3115902, at *4 ("adequate protection requires more than an opportunity to recoup a creditor's loss of collateral through the potential success of a speculative business venture.").

### 5. Debtor has no immediate or irreparable harm and engaged in prepetition bad acts.

Debtor faces no immediate or irreparable harm. First, Debtor has access to other financing. *See In re Lower Bucks Hosp.*, No. 10-102239, 2012 WL 13330344, at *3 (Bankr. E.D. Pa. Oct. 2, 2012) (finding evidence of immediate and irreparable harm when "Debtors do not have available sources of working capital or sufficient financing to carry on the operation of their business without Cash Collateral"). Non-Debtors already loaned Debtor $688,321.41 and can easily cover another $30,139. Doc. 15 at 14. Specifically, Sacks has $9,305,000 in assets, including $700,000 in cash

and $3 million in liquid assets. Ex. 12. Weston has $3 million in assets, $2.5 million of which are liquid. Ex. 19. The only reason Sacks does not use his millions to pay for Debtor's expenses is because he prefers to pay for luxury personal expenses like the mortgage on his $4 million Primary Residence. Ex. 1 at 131:8-20, 130:5-8; Ex. 12. In reality, their true goal is to waste the Collateral while they "spen[d] millions" on "lifestyles of the rich and the famous" that "would probably make you cringe." Ex. 20.

Second, Debtor's assertion that, without the cash collateral, it may lose its interest in cases or cease operations is baseless. Debtor presents no evidence it is at risk of losing an existing case. Not one penny of Debtor's budget is for case expenses like court reporters or experts. Doc 18-8. Debtor has one employee, an office administrator, who does no billable legal work. Ex. 17 at 14:10-14. Debtor has only two lawyers, partners Sacks and Weston, who will not generate revenue on post-petition accounts and who have no payroll cost. *Id.* at 16:25-17:12, 15:14-16:20. Debtor does not need a $16,000 monthly lease when Debtor does no legal work. As for the threat to the business from not paying rent, Debtor already has $58,000 in "Rent Arrears" that have not affected operations. Doc 15 at 12. Because Sacks and Weston do not work, paying rent or for an administrator will not help preserve the Collateral or improve cash flow. Doc 18-8. As for immediate risk, just one week before filing the Motion, Debtor's counsel agreed not to use the cash collateral and made no mention of any imminent risk. Ex. 22.

Finally, because of the following pre-petition misconduct, it is not equitable to authorize Debtor to further risk and waste the cash collateral:

- Debtor already converted and spent $3 million in Case Proceeds and 59% of the Restitution Payment. Ex. 9; Doc 15 at 2.

- Debtor has not paid one penny to Virage since July 28, 2020. Ex. 9.

- Sacks and Weston are millionaires but refuse to contribute one penny more to Debtor. Ex. 12; Ex. 19; Ex. 20.

- Debtor attempted to fraudulently transfer Debtor's interest in the Opioid Cases and stopped exclusively because of the TRO and Temporary Injunction. *Supra* at 2.

- Sacks fraudulently transferred millions in personal assets to prevent Virage from collecting on this debt. *Supra* §II(D).

- Debtor repeatedly violated the TRO and Temporary Injunction, continues to do so, and has continued to engage in procedural maneuvering. *Supra* at 3-4.

- Debtor misrepresented the effect of the bankruptcy stay for Non-Debtors and the enforceability of the Temporary Injunction to the Texas courts. *Supra* at 4.

- Debtor used Virage's counsel's extension of time to confer to instead file an ineffective removal of the Texas case to federal court and to file the Motion. *Supra* at 4.

- It is unfair for Sacks and Weston to live like millionaires at Virage's expense.

## IV.   CONCLUSON

For these reasons, Debtor has not met its burden of proof to provide adequate protection for Virage's cash collateral. Accordingly, Virage respectfully asks the Court to sustain Virage's objections and to deny the Motion.

Dated: September 11, 2023                Respectfully Submitted,

**AHMAD, ZAVITSANOS & MENSING, PLLC**

*/s/ Todd Mensing*
Todd Mensing
Texas Bar No. 24013156 (pro hac vice)
Cameron Byrd
Texas Bar No. 24097444 (pro hac vice)
Alexander M. Dvorscak
Texas Bar No. 24120461 (pro hac vice)
Justin Kenney
Texas Bar No. 24126702 (pro hac vice)
1221 McKinney Street, Suite 2500
Houston, Texas 77010
Telephone: 713-655-1101
Facsimile: 713-655-0062
tmensing@azalaw.com
cbyrd@azalaw.com
advorscak@azalaw.com
jkenney@azalaw.com

George Bochetto, Esquire
John A. O'Connell, Esquire
**BOCHETTO & LENTZ, PC**
1524 Locust Street
Philadelphia, PA 19102
Telephone: (215) 735-3900
gbochetto@bochettoandlentz.com
joconnell@bochettoendlentz.com

Lewis R. Landau
Attorney at Law
22287 Mulholland Hwy., # 318
Calabasas, CA 91302
Voice & Fax: (888)822-4340
lew@landaunet.com

**ATTORNEYS FOR VIRAGE SPV 1 LLC**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 11, 2023, a true and correct copy of *OBJECTIONS TO DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS (I) DETERMINING THAT CERTAIN FUNDS ARE NOT CASH COLLATERAL; (II) TO THE EXTENT THERE IS CASH COLLATERAL, AUTHORIZING USE THEREOF AND GRANTING PROVISIONAL ADEQUATE PROTECTION; (III) EXPEDITED HEARING; AND (IV) GRANTING RELATED RELIEF (THE "MOTION")* was served on the following counsel of record via CM/ECF system:

> Nicholas M. Engle, Esquire
> David B. Smith, Esquire
> Smith Kane Holman, LLC
> 112 Moores Road, Suite 300
> Malvern, PA 19355
> Telephone: (610) 407-7215
> Facsimile: (610) 407-7218

*/s/ Todd Mensing*
Todd Mensing
