**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | Civil Action No.: 23-12540-pmm |
| | : | |
| Sacks Weston, LLC | : | Chapter 11 |
| Debtor. | : | |

**OBJECTIONS TO DEBTOR'S MOTION PURSUANT TO 11 U.S.C. SECTION 1121(d) OF THE BANKRUPTCY CODE FOR AN ORDER EXTENDING THE EXCLUSIVE PERIODS DURING WHICH THE DEBTOR MAY FILE AND CONFIRM A PLAN OF REORGANIZATION ("MOTION")**

## I. INTRODUCTION

Debtor does not meet its burden to prove cause for extending the exclusivity periods. "[M]ere recitations of allegations" are "insufficient" because "submission of *evidence* to support the allegations of cause is a prerequisite," especially since "an extension [shall] not be granted routinely." *See In re Nicolet*, 80 B.R. 733, 741-42 (Bankr. E.D. Pa. 1987) (emphasis original); *In re Pine Run Trust*, 67 B.R. 432, 434 (Bankr. E.D. Pa. 1986). Because the Motion recites allegations with zero evidence, the Court can deny the Motion **on this basis alone**. The Motion also provides zero evidence to support the traditional factors for obtaining an extension:

1. Debtor is not "large" and has zero "difficulty in formulating a plan of reorganization." *See In re Nicolet*, 80 B.R. at 741-42. Debtor is small, has only sixteen cases, and has a manageable number of creditors.

2. Debtor has made zero "progress in formulating a plan" with creditors. *See id.*

3. There are zero "unusual procedural or substantive difficulties" that prevent formulating a plan. *Id.* Debtor's litigation with Virage is not a reason to extend the exclusivity periods or to delay providing a plan.

4. Debtor has zero "promise of probable success in formulating a plan of reorganization" at all, let alone with "additional time." *See id.*; *In re Pine Run Trust*, 67 B.R. at 435-36. Debtor has been insolvent for years, has no prospect of positive cash flow, and will have zero litigators in one year. An extra sixty days will not help Debtor formulate a successful plan.

1

Also, denying the Motion will not "require the Debtor to file a plan by December 23, 2023." Mot. at 4. Instead, the sole consequence will be that Debtor will "no longer ha[ve] the **exclusive** right to file a plan," which "does not affect its **concurrent** right to file a plan." *See In re Parker Street Florist & Garden Center*, 31 B.R. 206, 208 (Bankr. D. Mass. 1983) (emphasis added).

Finally, the Motion confirms that this Chapter 11 case should be dismissed. Previously, the Court asked Debtor to "address the elephant in the room" of "how this law firm is operating going forward if no one is practicing." Ex. 27 at 13:8-10. The Motion now answers that Debtor may seek to "transition some or all of its cases to another law firm." Mot. at 2. Far from supporting **reorganization**, this is a **liquidation** plan in which Debtor ceases legal work and becomes a mere bank account that receives a smaller share of attorney's fees—100% of which are Virage's collateral. This reduced fee share diminishes the estate instead of enhancing it. This proposal also highlights that Debtor's Chapter 11 petition has been mere forum shopping to avoid the temporary injunction in Texas and to delay Virage's collection on its personal guarantees with Debtor's multi-millionaire principals, Andrew Sacks and John Weston. Accordingly, Virage asks the Court to set a briefing schedule for dismissal under Section 1112(b).

## II.    BACKGROUND

**A.  Virage loaned millions to Debtor and obtained a perfected security interest.**

Virage SPV I LLC ("Virage") is a lender that helps lawyers finance cases. On June 5, 2017, Virage, Debtor, and "Non-Debtors" Andrew Sacks, John Weston, Sacks & Weston P.C., Scott Diamond, and Diamond Law P.C. executed the Loan Agreement with Virage as lender, Debtor as "Borrower," and Non-Debtors as unconditional "Guarantors." Ex. 5 at VCM_SW0000895-896, 908, 919. Virage amended and replaced prior loans and advanced new funds. *Id.* The new principal was $5,794,960.92. *Id.* Virage's debt in this case is now $14,498,570.08. *See* Claim No. 10.

2

Virage's security interest attached and perfected upon: (a) Virage's payment of the old principal and new advance; (b) the parties executing the loan documents, which describe the collateral; (c) Debtor obtaining rights in the collateral; and (d) Virage filing financing and continuation statements. Ex. 7; Ex. 8; *see* Tex. Bus. & Com. Code §§ 9.203(a), 9.310(a); Ex. 5 § 11.13(b) (Texas law applies); *In re Fineberg*, 202 B.R. 206, 218-19 (Bankr. E.D. Pa. 1996) (applying contractual choice-of-law provision).

### B. Virage's collateral includes the Restitution Payment and all post-petition fees.

Virage's "Collateral" includes 100% of Debtor's pre-petition "accounts," which are accounts receivable for fee interests or reimbursed expenses for any case in which Debtor has or will have an interest. *See* Tex. Bus. & Com. Code § 9.102(a)(2)(ii). Specifically, under the Security Agreement, Virage's "Collateral" includes "Accounts," and "Proceeds" on "any Eligible Case or Eligible Collateral Case," "whether now owned or existing or hereafter created." Ex. 25 § 1. Under the Loan Agreement, Virage has a security interest "in all of the Case Proceeds of all Eligible Cases and Eligible Collateral Cases whether now owned or hereafter acquired." Ex. 5 § 10.1. "Eligible Cases" are the cases listed on Schedule 1.1. *Id.* at VCM_SW0000892. "Eligible Collateral Cases" are "all" other "of Borrower's cases or claims in which the Borrower has been retained or is subsequently retained as legal counsel." *Id.* "Case Proceeds" are "proceeds" of any kind, including "amounts received on account of fees and expenses" **and** "recoveries" by "lawsuit, settlement, or otherwise" against "attorneys" or "related parties" like Diamond's $274,913.13 "Restitution Payment" for stealing Case Proceeds. *Id.* at VCM_SW0000891.

Except for $12,250 received in sublease rent, all of Debtor's cash on hand is cash collateral. Specifically, except for this rent, Sacks and Weston admitted that: (1) as of August 4, 2023, Debtor's bank accounts contained "$172,843.50"; (2) 100% of this $172,843.50 is from the

Restitution Payment, which is all Debtor is "living off"; and (3) this Restitution Payment is 100% "case proceeds." Ex. 1 at 123:17-23, 119:18-120:7; Ex. 21; Ex. 17 at 9:13-15, 34:8-9; Ex. 26 at 23:8-24:4, 16:6-17, 25:25-26:19. This cash is thus "proceeds" and cash collateral in which Virage's security interest remains automatically attached and perfected. *See* Tex. Bus. & Com. Code §§ 9.102(a)(65), 9.315(a)-(b).

Debtor's future case revenue is also 100% cash collateral. Debtor has 16 cases. Ex. 29; Ex. 26 at 7:14-8:13, 14:23-17:1; Dkt # 63 at 8-9. Debtor concedes that "all 16 cases in the September 27, 2023 Status of Current Cases report are pre-petition cases." Ex. 26 at 26:24-27:2. Because Virage's security interest covers all "proceeds" of these 16 **pre-petition** "accounts," Virage's security interest covers all **post-petition** fees earned on these 16 accounts. *See* 11 U.S.C. § 552(b) ("if the security interest created by [the pre-petition] security agreement extends to property of the debtor acquired before the commencement of the case **and to proceeds** . . . **then such security interest extends to such proceeds** . . . acquired by the estate **after** commencement of the case") (emphasis added). Because any post-petition fees from pre-petition cases are proceeds of these pre-petition accounts, these post-petition fees are cash collateral. *See id.*; *In re LightStyles, Ltd.*, No. 1:12-bk-03711, 2012 WL 3115902, at *3 (Bankr. M.D. Pa. July 27, 2012) (post-petition "payments from pre-petition accounts receivable" are cash collateral); *In re Bumper Sales, Inc.*, 907 F.2d 1430, 1436-41 (4th Cir. 1990) (the "security interest in [the debtor's] pre-petition inventory and accounts continues in the [post-petition] cash proceeds" thereof).

**C. Debtor and Non-Debtors breached the Loan Agreement.**

It is uncontroverted that Debtor and Non-Debtors breached the Loan Agreement by:

- Failing to pay to Virage 60% of Case Proceeds before default, failing to pay to Virage 100% of Case Proceeds after default, and converting over $3 million in Case Proceeds;
- Failing to pay the loan in full on or before the Maturity Date of June 26, 2021;

4

- Failing to provide complete reporting under Section 7.3 of the Loan Agreement, which requires reporting on the status of each case and material changes in personal assets;

- Diamond ceasing to be a partner in Debtor; and

- Attempting to sell Debtor's "Opioid Cases" without Virage's authorization.

Ex. 4 ¶ 8; Ex. 5, VCM_SW0000905, 896 (nonpayment defaults); 903, 894 (reporting defaults); 906, 891 (Diamond default); 905 (Opioid Cases default); Ex. 9 (payment history); Ex. 10 at 45:4-73:9 (Virage's testimony regarding defaults), 234:21-235:23 (Texas court finding fraudulent transfers and defaults), 242:25-243:5 (Debtor conceding breaches).

### D. Debtor and Sacks engaged in fraudulent transfers.

While insolvent, for token consideration, Sacks transferred a $4 million "Primary Residence" and $3.1 million "Morgan Stanley Margin Account" into tenancies by entireties to hinder, delay, or defraud Virage. Ex. 12; Ex. 13; Ex. 1 at 35:13-36:21, 38:24-39:08, 46:19-47:09, 48:22-49:22, 55:3-5; *Garden State Standardbred Sales v. Seese*, 417 Pa. Super. 15, 23 (1992) ("when a spouse conveys individual property to a tenancy by the entireties in fraud of creditors, the creditor may nevertheless execute against the property"); Ex. 4 ¶¶ 9-13.

Virage sued on March 24, 2023 in Houston for breach of contract, fraudulent transfer, and declaratory judgment. During discovery, Sacks attempted to sell Debtor's fee interest in the Opioid Cases for what would have been pennies on the dollar. Ex. 2; Ex. 11; Ex. 14; Ex. 23; Ex. 24; Ex. Ex. 10 at 66:19-67:11. When one broker, Rita Reynolds, confronted Sacks that he could not sell Virage's collateral, Sacks responded "[t]he hell I can't" and "[f]uck them." Ex. 2. Sacks then threatened her to "say zero to those lying bastards." *Id.*

### E. Virage obtained injunctions. Debtor and Non-Debtors began forum shopping.

On July 31, 2023, Virage obtained a temporary restraining order (the "TRO") that: (1) found Debtor and Non-Debtors breached the Loan Agreement; (2) found Sacks fraudulently

5

transferred personal assets; (3) found Debtor attempted to fraudulently transfer the Opioid Cases; (4) found Debtor and Non-Debtors are insolvent; and (5) prohibited Debtor and Non-Debtors from transferring Collateral, required reporting about the Collateral, and required them to deposit 100% of any Collateral proceeds into the court's registry. Ex. 3. They refused to comply.

The parties then conducted expedited discovery, including depositions and producing thousands of documents. The Texas court heard five hours of evidence, including four witnesses, deposition designations, 100+ exhibits, and post-hearing briefing. On August 18, 2023, the Texas court entered the "Temporary Injunction," essentially repeating the findings and relief from the TRO, with the change that Debtor was only required to deposit 60% of collateral proceeds into the court's registry. Ex. 4. The Court found that the Restitution Payment is "proceeds of Collateral":

> 6. ==Virage demonstrated it has an attached, perfected, first-priority security interest in the "Collateral,"== which is any attorney's fees, expenses, or other financial recoveries that the Firm is or may become entitled to in connection with the litigation matters identified as the "Eligible Cases" and "Eligible Collateral Cases" in the Loan Agreement. The "Eligible Cases" are the specific cases listed in Schedule 1.1 of the Loan Agreement. The "Eligible Collateral Cases" are the litigation matters identified in Schedule 1.2 of the Loan Agreement and all the Firm's cases or claims in which the Firm has been retained, is subsequently retained, or otherwise has a legal interest. The Collateral includes Defendants' opioid cases. ==The Collateral also includes proceeds of restitution payments received from Defendant Diamond for theft of proceeds of Collateral.==

Debtor and Non-Debtors refused to comply. Instead, they began forum shopping. They appealed for an emergency stay. When that failed, Debtor filed Chapter 11. Debtor then filed suggestions of bankruptcy **incorrectly** claiming the petition stayed proceedings against Non-Debtors. *See McCartney v. Integra Nat'l Bank N.*, 106 F.3d 506, 509-10 (3d Cir.1997). Weston then removed the Texas case to federal court and moved to transfer the Texas case to Philadelphia despite the Loan Agreement's forum-selection clause. Virage's motion to remand is pending.

### F.  Debtor and Non-Debtors are insolvent and reorganization is futile.

Debtor is insolvent, has no prospect of positive cash flow, and has zero "plan right now on how the firm will successfully emerge from bankruptcy." Ex. 26 at 9:22-10:6.

6

On insolvency, Debtor **and** Non-Debtors have been insolvent since 2017. Ex. 15; Ex. 10 at 68:13-20, 83:5-87:19, 130:24-133:12; Ex. 16. Debtor's current net worth is "-15,153,022," Debtor's net worth is decreasing by the month, and Debtor's only asset with known value is cash in the bank, which is now only $84,338. Dkt #56; Dkt #78; Ex. 26 at 25:1-24.

For Debtor's 16 cases, Debtor speculates that the undiscounted future value of these cases could be about $3.6 million—far less than the $14.5 million owed to Virage—of which: (1) two cases will pay only $8,500, and (2) fourteen cases are contingent, have paid nothing, may never pay, and have an "unknown" value that "won't be determined until each case is either settled or tried to a verdict." Ex. 29; Ex. 28; Ex. 26 at 16:6-17, 25:19-26:19, 22:18-23:7.

For cash flow, Debtor also has no prospect of positive cash flow:

1. On the Opioid Cases, which are Collateral, Debtor **may** receive **some** fees by December 2023. Debtor does not know what this amount will be. Ex. 26 at 22:18-23:7.

2. Debtor has no firm estimate of how much or when its cases will pay. *Id.* at 16:6-17, 25:19-26:19, 22:18-23:7.

3. Between August 31, 2023 and October 25, 2023, the only non-case revenue Debtor received is $12,250 in rent, $11,250 of which is only paid quarterly. *Id.* at 23:15-24:4.

4. Other than speculative case receipts, this small rent, and a potential health insurance reimbursement, Debtor has no other source of projected revenue. *Id.* at 36:5-13.

5. In addition to $22,180 in monthly general and administrative expenses (e.g., rent, payroll), Debtor estimates $35,000 in case expenses between now and June 2024. *Id.* at 27:25-28:25.

6. Debtor has no cash-flow estimates and will have $0 in 3 months absent spending cash collateral or contributions from principals. *Id.* at 37:1-22.

7. Debtor assumes zero payments to Virage as a secured creditor, has made zero payments to Virage since 2020, and has no plans to pay unsecured creditors. *Id.* at 37:23-38:10; Ex. 9.

8. Debtor converted $3,061,562.06 in Case Proceeds and "would have been out of business years ago if" Debtor paid "60%" of Case Proceeds to Virage as required. Ex. 9; Ex. 18.

Debtor's actual "plan" is: (1) Weston will "retire" in "about a year," (2) Debtor will **not** hire another lawyer, and (3) as has been the case since **1986**, Sacks will do zero litigation work:

```
14      Q.  Mr. Weston, when do you intend to retire from
15   the practice of law?
16      A.  A good question.  I have told Andrew that I
17   would like to retire in about a year.  We have -- we
18   have a lease that goes a little bit beyond that.  We
19   have some cases that need to be handled during the
20   interim, but that's my goal.

15      Q.  Does Sacks Weston, LLC, currently have any
16   plans to hire new lawyers to replace you at the firm?
17      A.  Not so far as I know.
18      Q.  Could Sacks Weston, LLC, at the moment afford
19   to hire a new lawyer to replace you at the firm?
20      A.  I doubt it.

21      Q.  To your knowledge, when was the last time that
22   Mr. Sacks wrote a legal brief that was filed with the
23   Court?
24      A.  When was the last time he did what?
25      Q.  The last time that Mr. Sacks filed, let's say,

1   a motion, wrote a motion that was filed with the Court?
2       A.  I would guess that that would have been 1985 or
3   '86.
4       Q.  How about the last time that Mr. Sacks took a
5   deposition?
6           When would that have been?
7       A.  I know that he assisted me on a deposition in
8   the Zena Jordan case during that same time frame, '85 or
9   '86.
10      Q.  When was the last time to your knowledge that
11   Mr. Sacks argued a hearing in a court?
12      A.  Same -- same time frame, those two years.
13      Q.  And when to your knowledge was the last time
14   that Mr. Sacks tried a case in a court of law?
15      A.  I don't think Andrew has ever tried a case.
```

Ex. 17 at 15:14-17:15; Ex. 26 at 38:11-18.

### G. Debtor contradicts its cash-collateral briefing, withdrew its final cash-collateral motion, and violated the interim cash-collateral order.

At the cash-collateral hearing, Debtor claimed it would be "ethically" obligated to transfer its 16 cases to another firm and would lose its fees if the Court did not approve this budget. Ex. 27 at 4:18-5:18, 21:8-21. Debtor later admitted this is false because "no client or co-counsel has threatened to terminate Sacks Weston LLC" and any such termination due to Debtor's operations

8

or budget is "completely speculative." Ex. 26 at 32:19-33:4. Far from needing to use Virage's collateral to pay for unnecessary expenses, Debtor also admitted there is "no legal" or "practical reason" why Sacks and Weston could not pay the requested $22,180 in monthly expenses from their $12 million in personal assets. Dkt #37; Ex. 26 at 30:1-5, 31:19-25; Ex. 12; Ex. 19. Unsurprisingly, after these admissions, Debtor withdrew its final cash-collateral motion. Dkt #69. Nevertheless, Debtor improperly spent $1,592.85 on an unapproved accountant. Dkt #78 at 14.

Now that crying wolf about losing its clients failed, Debtor flip flops and claims it **plans** to lose its clients by "transition[ing] some or all of its cases to another law firm." Mot. at 2. This plan thus treats the Court's question of "how this law firm is operating going forward if no one is practicing" as a trick question to which the answer is "we will let another law firm practice for us." *See* Ex. 27 at 13:8-10. This trick simply confirms that Debtor has no chance of reorganization, this Chapter 11 case has been a mere delay tactic, and dismissal is appropriate.

### III.   ARGUMENT

#### A. Debtor is not large and has no difficulty in formulating a plan.

Debtor is not "large" and there is no "difficulty in formulating a plan." *See In re Nicolet*, 80 B.R. at 744 (a large or difficult reorganization is one involving 17,000 tort claims against the debtor). Debtor has 16 cases, minimal cash, one lawyer who will retire soon, and one lawyer who does not work. *Supra* Section II(F). For creditors, Debtor's main creditor is Virage, and the other unsecured claims are manageable. Dkt #1. There is no evidence of difficulty in formulating a plan.

#### B. Debtor has made no progress in formulating a plan with creditors.

Debtor presents no evidence of progress in negotiating a plan with Virage or any creditor in four months. *See In re Pine Run Trust*, 67 B.R. at 435-436 (extending exclusivity periods because the plan was substantially complete with creditors and would be "concluded shortly").

9

Instead, the Motion omits that Debtor admitted it intends to pay Virage zero and has no plan to pay unsecured creditors. Ex. 26 at 37:23-38:10. As for negotiating with clients and another law firm about transferring Debtor's cases, Debtor presents no evidence of these negotiations or how such a transfer would enhance (rather than diminish) the size of the estate. In reality, transferring cases equals liquidation, which is why the Court should dismiss this case.

### C. Debtor presents no evidence of unusual procedural or substantive difficulties.

Debtor's litigation with Virage is not a reason to extend the exclusivity periods or to delay providing a plan. Mot. at 2. Instead, Debtor should "propose its plan taking into consideration the possible results of [those disputes]." *See In re Parker Street Florist & Garden Center*, 31 B.R. at 208 (denying a motion to extend the exclusivity periods on the basis of a pending "related adversary proceeding"). Also, denying the Motion means Debtor no longer has the "exclusive right" to file a plan, not that Debtor must file a plan. *See id.*; Mot. at 4.

### D. Debtor has zero promise of probable success in formulating a reorganization plan. An additional sixty days will not change this.

Debtor presents zero evidence in support of Debtor's prospects for formulating a successful reorganization plan. In fact, these uncontroverted facts establish that Debtor has zero chance of success in formulating a reorganization plan (whether now or sixty days from now):

- Debtor has no plan and no draft of a plan. Ex. 26 at 9:22-10:6.

- Debtor assumes zero payments to Virage as a secured creditor, has made zero payments to Virage since 2020, and has no plans to pay unsecured creditors. *Id.* at 37:23-38:10; Ex. 9.

- Weston is the only lawyer who performs billable work, will retire within a year, and will generate no post-petition legal work. Ex. 17 at 15:14-17:15; Ex. 26 at 38:11-18.

- Debtor is insolvent by $15 million, has been insolvent since 2017, and has minimal remaining cash that is shrinking each month (most of which is cash collateral). Ex. 26 at 25:1-24; Ex. 15; Ex. 10 at 68:13-20, 83:5-87:19, 130:24-133:12; Ex. 16; Dkt #56; Dkt #78.

- For the Opioid Cases, which are Collateral, Debtor **may** receive **some** fees by December 2023. Debtor does not know what this amount will be. Ex. 26 at 22:18-23:7

- The value of Debtor's cases is "unknown," and Debtor has no concrete estimate for when these cases will pay. *Id.* at 16:6-17, 25:19-26:19, 22:18-23:7.

- Between August 31, 2023 and October 25, 2023, Debtor will have received only $12,250 in rent, $11,250 of which is only paid quarterly. Ex. 26 at 23:15-24:4.

- Other than these case receipts, rent, and a potential reimbursement on a health insurance policy, Debtor has no other source of projected revenue. *Id.* at 36:5-13.

- In addition to Debtor's now-withdrawn cash collateral budget of $22,180, Debtor has $35,000 in expected case expenses that Debtor cannot cover. *Id.* at 27:25-28:25.

- Debtor has no cash-flow estimates and will have $0 in 3 months absent spending cash collateral or contributions from principals. *Id.* at 37:1-22.

- Debtor converted $3,061,562.06 in Case Proceeds and "would have been out of business years ago if" Debtor paid "60%" of Case Proceeds to Virage as required. Ex. 9; Ex. 18.

For these reasons, Debtor has zero promise of probable success in formulating a reorganization plan. Debtor has presented zero evidence on this point and zero evidence that an additional sixty days will change anything.

## IV.    CONCLUSON

For these reasons, Virage asks the Court to deny the Motion and to set a briefing schedule for dismissing Debtor's case under Section 1112(b).

Dated: December 6, 2023

Respectfully Submitted,

**AHMAD, ZAVITSANOS & MENSING, PLLC**

*/s/ Todd Mensing*
Todd Mensing
Texas Bar No. 24013156
Cameron Byrd
Texas Bar No. 24097444
Alexander M. Dvorscak
Texas Bar No. 24120461
Justin Kenney
Texas Bar No. 24126702
1221 McKinney Street, Suite 2500
Houston, Texas 77010
Telephone: 713-655-1101
Facsimile: 713-655-0062
tmensing@azalaw.com
cbyrd@azalaw.com
advorscak@azalaw.com
jkenney@azalaw.com

George Bochetto, Esquire
John A. O'Connell, Esquire
**BOCHETTO & LENTZ, PC**
1524 Locust Street
Philadelphia, PA 19102
Telephone: (215) 735-3900
gbochetto@bochettoandlentz.com
joconnell@bochettoendlentz.com
Lewis R. Landau
Attorney at Law
22287 Mulholland Hwy., # 318
Calabasas, CA 91302
Voice & Fax: (888)822-4340
lew@landaunet.com

**ATTORNEYS FOR VIRAGE SPV 1 LLC**

**CERTIFICATE OF SERVICE**

    I hereby certify that, on December 6, 2023, a true and correct copy of *OBJECTIONS TO DEBTOR'S MOTION PURSUANT TO 11 U.S.C. SECTION 1121(d) OF BANKRUPTCY CODE FOR AN ORDER EXTENDING THE EXCLUSIVE PERIODS DURING WHICH THE DEBTOR MAY FILE AND CONFIRM A PLAN OF REORGANIZATION* was served on the following counsel of record via CM/ECF system:

David B. Smith, Esquire
Nicholas M. Engle, Esquire
Smith Kane Holman, LLC
112 Moores Road, Suite 300
Malvern, PA 19355
Telephone: (610) 407-7215
Facsimile: (610) 407-7218

                                              */s/ Todd Mensing*
                                              Todd Mensing