## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Civil Action No.: 23-12540-pmm |
| | : | |
| Sacks Weston, LLC | : | Chapter 11 |
| Debtor. | : | |

_____ :

### OBJECTIONS TO MOTION FOR (I) A DETERMINATION REGARDING THE APPLICABILITY OF 11 U.S.C. § 552 TO LEGAL FEES EARNED POSTPETITION AND (II) APPROVAL OF AN EXPEDITED PROCEDURE BY WHICH THE DEBTOR'S CASE REVENUES SHALL BE CHARACTERIZED AS AND BETWEEN PREPETITION AND POSTPETITION EARNINGS (THE "MOTION")

### I.    INTRODUCTION

Seeking to cut off Virage's security interest covering proceeds from Debtor's contingency fee accounts earned post-petition, Debtor ignores clear caselaw holding that Section 552 maintains Virage's security interest. The Eastern District of Pennsylvania has specifically held that a secured creditor's right to payment pursuant to a law firm's contingency fee agreement constituted an interest in "accounts" under the U.C.C. *U.S. Claims, Inc. v. Flomenhaft & Cannata, LLC*, 519 F. Supp. 2d 515 (E.D. Pa. 2006). Any payments received by Debtor pursuant to these contingency fee accounts constitutes "proceeds" of Virage's collateral that is automatically perfected under Section 9-315 of the U.C.C. *Id.*; *see also* Tex. Bus. & Com. Code §§ 9.102(a)(65), 9.315(d). The First Circuit specifically analyzed whether Section 552 cut off this perfected lien in proceeds when work was performed on a contingency fee account post-petition, and found that it did not. *Cadle Co. v. Schlichtmann*, 267 F.3d 14, 20–21 (1st Cir. 2001).

With the caselaw clearly against them, Debtor cites a variety of other cases that do not overrule or contradict *U.S. Claims* or *Cadle.* This includes analogizing Debtor to a restaurant with a secured lien covering its inventory and to a law firm seeking to recover fees from an attorney

who took a case after a client fired its former representation. Both are factually irrelevant and are consistent with Virage's continued security interest.

Debtor also makes a Hail Mary pass to the equities. But the equitable exception to Section 552 applies only when the creditor is *over*-secured—here Virage is likely *under*-secured by over $10 million. *In re Tower Air, Inc.*, 397 F.3d 191, 205 (3d Cir. 2005). Further, Debtor's conduct has been anything but equitable. It has already spent at least $24,046 of Virage's cash collateral in the first two months (subtracting out $13,250 purportedly attributable to rent). Dkt #71; Dkt #78. And Debtor improperly spent $1,592.85 on an accountant without Court approval just days after withdrawing its cash collateral motion. Dkt #78 at 14. This is above and beyond the $3,061,562.06 worth of Virage's collateral that the Debtor converted prior to the litigation. Ex. 9.

Finally, Debtor's motion is not only legally incorrect, but it is also premature. Debtor has provided no fee statements or evidence of any post-petition work. For Debtor's opioid cases, it receives the same fee even if it performs no additional work. Ex. 32; Ex. 33. There is no evidence in the record that the same is not true for all of Debtor's cases. Debtor also keeps no time records for its personal injury cases. Ex. 26 at 32:6-11. Accordingly, there is no basis on which to bifurcate proceeds from the contingency fee accounts even if this Court wanted to provide Debtor with equitable relief.

## II.    FACTUAL BACKGROUND

### A.  Virage loaned millions to Debtor and obtained a perfected security interest.

Virage SPV I LLC ("Virage") is a lender that helps lawyers finance cases. On June 5, 2017, Virage, Debtor, and "Non-Debtors" Andrew Sacks, John Weston, Sacks & Weston P.C., Scott Diamond, and Diamond Law P.C. executed the Loan Agreement with Virage as lender, Debtor as "Borrower," and Non-Debtors as unconditional "Guarantors." Ex. 5 at VCM_SW0000895-896,

908-09, 919. Virage amended and replaced prior loans and advanced new funds. *Id.* The new principal was $5,794,960.92. *Id.* Virage's debt in this case is now $14,498,570.08. *See* Ex. 31.

Virage's security interest attached and perfected upon: (a) Virage's payment of the old principal and new advance; (b) the parties executing the loan documents, which describe the collateral; (c) Debtor obtaining rights in the collateral; and (d) Virage filing financing and continuation statements. Ex. 7; Ex. 8; *See* Tex. Bus. & Com. Code § 9.203(a), 9.310(a); Ex. 5 § 11.13(b) (Texas law applies); *In re Fineberg*, 202 B.R. 206, 218–19 (Bankr. E.D. Pa. 1996) (applying contractual choice-of-law provision).

**B. Virage's collateral includes the Restitution Payment and all post-petition fees.**

Virage's "Collateral" includes 100% of Debtor's pre-petition "accounts," which are accounts receivable for fee interests or reimbursed expenses for any case in which Debtor has or will have an interest. *See* Tex. Bus. & Com. Code § 9.102(a)(2)(ii). Under the Security Agreement, Virage's "Collateral" includes "Accounts," and "Proceeds" on "any Eligible Case or Eligible Collateral Case," "whether now owned or existing or hereafter created." Ex. 25 § 1. Under the Loan Agreement, Virage has a security interest "in all of the Case Proceeds of all Eligible Cases and Eligible Collateral Cases whether now owned or hereafter acquired." Ex. 5 § 10.1. "Eligible Cases" are the cases listed on Schedule 1.1. *Id.* at VCM_SW0000892. "Eligible Collateral Cases" are "all" other "of Borrower's cases or claims in which the Borrower has been retained or is subsequently retained as legal counsel." *Id.* "Case Proceeds" are "proceeds" of any kind, including "amounts received on account of fees and expenses" **and** "recoveries" by "lawsuit, settlement, or otherwise" against "attorneys" or "related parties" like Diamond's $274,913.13 "Restitution Payment" for stealing Case Proceeds. *Id.* at VCM_SW0000891.

– 3 –

Except for $15,250 received in purported sublease rent (which has already been spent), all of Debtor's cash on hand is cash collateral. Specifically, except for this rent, Sacks and Weston admitted that: (1) as of August 4, 2023, Debtor's bank accounts contained "$172,843.50"; (2) 100% of this $172,843.50 is from the Restitution Payment, which is all Debtor is "living off"; and (3) this Restitution Payment is 100% "case proceeds." Ex. 1 at 123:17-23, 119:18-120:7; Ex. 21; Ex. 17 at 9:13-15, 34:8-9; Ex. 26 at 23:8-24:4, 25:25-26:19. This cash is thus "proceeds" and cash collateral in which Virage's security interest remains automatically attached and perfected. *See* Tex. Bus. & Com. Code §§ 9.102(a)(65), 9.315(a)-(b).

Debtor's future case revenue is also 100% cash collateral. Debtor has 16 cases. Ex. 29; Ex. 26 at 7:14-8:13, 14:23-17:1; Dkt #63 at 8–9. Debtor concedes that "all 16 cases in the September 27, 2023 Status of Current Cases report are pre-petition cases." Ex. 26 at 26:24-27:2. Because Virage's security interest covers all "proceeds" of these 16 **pre-petition** "accounts," Virage's security interest covers all **post-petition** fees earned on these 16 accounts. *See* 11 U.S.C. § 552(b) ("[I]f the security interest created by [the pre-petition] security agreement extends to property of the debtor acquired before the commencement of the case **and to proceeds** . . . **then such security interest extends to such proceeds** . . . acquired by the estate **after** commencement of the case") (emphasis added). Because any post-petition fees from pre-petition cases are proceeds of these pre-petition accounts, these post-petition fees are cash collateral. *See id.*; *In re LightStyles, Ltd.*, No. 1:12-bk-03711, 2012 WL 3115902, at *3 (Bankr. M.D. Pa. July 27, 2012) (post-petition payments "from pre-petition accounts receivable" are cash collateral); *In re Bumper Sales, Inc.*, 907 F.2d 1430, 1436–41 (4th Cir. 1990) (holding "[Creditor's] security interest in [debtor's] pre-petition inventory and accounts continues in the [post-petition] cash proceeds" thereof). Virage's security interest in Debtor's contingency fee accounts continues even if the Debtor continues to

– 4 –

work on the cases post-petition. *See Cadle Co. v. Schlichtmann*, 267 F.3d 14, 20–21 (1st Cir. 2001);

*infra.*

### C. Debtor and Non-Debtors breached the Loan Agreement.

It is uncontroverted that Debtor and Non-Debtors breached the Loan Agreement by:

- Failing to pay to Virage 60% of Case Proceeds before default, failing to pay to Virage 100% of Case Proceeds after default, and converting over $3 million in Case Proceeds.

- Failing to pay the loan in full on or before the Maturity Date of June 26, 2021;

- Failing to provide complete reporting under Section 7.3 of the Loan Agreement, which requires reporting on the status of each case and material changes in personal assets;

- Diamond ceasing to be a partner in Debtor; and

- Attempting to sell Debtor's "Opioid Cases" without Virage's authorization.

Ex. 4 ¶ 9; Ex. 5, VCM_SW0000905, 896 (nonpayment defaults); 903, 894 (reporting defaults); 906, 891 (Diamond default); 905 (Opioid Cases default); Ex. 9 (payment history); Ex. 10 at 45:4-73:9 (Virage's testimony regarding defaults), 234:21-235:23 (Texas court recognizing fraudulent transfers and defaults), 242:25-243:7 (Debtor conceding breaches).

### D. Debtor and Sacks engaged in fraudulent transfers.

While insolvent, for token consideration, Sacks transferred a $4 million "Primary Residence" and $3.1 million "Morgan Stanley Margin Account" into tenancies by entireties to hinder, delay, or defraud Virage. Ex. 12; Ex. 13; Ex. 1 at 35:13-36:21, 38:24-39:08, 46:19-47:09, 48:22-49:22, 55:3-5; *Garden State Standardbred Sales v. Seese*, 417 Pa. Super. 15, 23 (1992) ("[W]hen a spouse conveys individual property to a tenancy by the entireties in fraud of creditors, the creditor may nevertheless execute against the property"); Ex. 4 ¶¶ 9–13.

Virage sued on March 24, 2023 in Houston for breach of contract, fraudulent transfer, and declaratory judgment. During discovery, Sacks attempted to sell Debtor's fee interest in the Opioid Cases for what would have been pennies on the dollar. Ex. 2; Ex. 11; Ex. 14; Ex. 23; Ex. 24; Ex. 10

at 66:19-67:11. When one broker, Rita Reynolds, confronted Sacks that he could not sell Virage's collateral, Sacks responded "[t]he hell I can't" and "[f]uck them." Ex. 2. Sacks then threatened her to "say zero to those lying bastards." *Id.*

### E. Virage obtained injunctions. Debtor began forum shopping.

On July 31, 2023, Virage obtained a temporary restraining order (the "TRO") that: (1) found Debtor and Non-Debtors breached the Loan Agreement; (2) found Sacks fraudulently transferred personal assets; (3) found Debtor attempted to fraudulently transfer the Opioid Cases; (4) found Debtor and Non-Debtors are insolvent; and (5) prohibited Debtor and Non-Debtors from transferring Collateral, required reporting about the Collateral, and required them to deposit 100% of any Collateral proceeds into the court's registry. Ex. 3. They refused to comply.

The parties then conducted expedited discovery, including depositions and producing thousands of documents. The Texas court heard five hours of evidence, including four witnesses, deposition designations, 100+ exhibits, and post-hearing briefing. *See generally* Ex. 10. On August 18, 2023, the Texas court entered the "Temporary Injunction," essentially repeating the findings and relief from the TRO, with the change that Debtor was only required to deposit 60% of collateral proceeds into the court's registry. Ex. 4. The Court found that the Restitution Payment is "proceeds of Collateral":

> 6.  Virage demonstrated it has an attached, perfected, first-priority security interest in the "Collateral," which is any attorney's fees, expenses, or other financial recoveries that the Firm is or may become entitled to in connection with the litigation matters identified as the "Eligible Cases" and "Eligible Collateral Cases" in the Loan Agreement. The "Eligible Cases" are the specific cases listed in Schedule 1.1 of the Loan Agreement. The "Eligible Collateral Cases" are the litigation matters identified in Schedule 1.2 of the Loan Agreement and all the Firm's cases or claims in which the Firm has been retained, is subsequently retained, or otherwise has a legal interest. The Collateral includes Defendants' opioid cases. The Collateral also includes proceeds of restitution payments received from Defendant Diamond for theft of proceeds of Collateral.

Debtor and Non-Debtors refused to comply. Instead, they began forum shopping. They appealed for an emergency stay. When that failed, Debtor filed Chapter 11. Debtor then filed

suggestions of bankruptcy **incorrectly** claiming the petition stayed proceedings against Non-Debtors. *See McCartney v. Integra Nat'l Bank N.*, 106 F.3d 506, 509–10 (3d Cir. 1997). Weston then removed the Texas case to federal court and moved to transfer the Texas case to Philadelphia despite the Loan Agreement's forum-selection clause.

Virage's motion to remand is pending. Based on the Minute Entry and Order from the court in the Southern District of Texas, it is likely that court will not rule on the remand or transfer motions until after this Court rules on Virage's motion to dismiss after February 21. *See* 4:23-cv-03292, Dkt #30 (requiring Debtor "to file a copy of the Chapter 11 plan filed in the Eastern District of Pennsylvania Bankruptcy Court. If such plan is not filed by the intended date of February 21, 2024, [Debtor] must file a report on the status of the case in that court.").

**F.  Debtor and Non-Debtors are insolvent and reorganization is futile.**

Debtor is insolvent, has no prospect of positive cash flow, and has zero plan right now on "how the Debtor intends to emerge from this bankruptcy successfully." Ex. 26 at 9:22-10:6.

On insolvency, Debtor **and** Non-Debtors have been insolvent since 2017. Ex. 15; Ex. 10 at 68:13-20, 83:5-87:19, 130:24-133:12; Ex. 16. Debtor's current net worth is reported at "$-15,142,720." Dkt #97. Without cash infusions from the principals, Debtor's net worth is decreasing by the month, and Debtor's only asset with known value is cash in the bank, which as of December 31, 2023 equaled $94,640. Dkt #56; Dkt #97; Ex. 26 at 25:1-24.

For Debtor's 16 cases, Debtor speculates that the undiscounted future value of these cases could be about $3.6 million—far less than the $14.5 million owed to Virage—of which: (1) two cases have paid "fees" of $7,000 and "billable expense income" of $4,747, and (2) fourteen cases are contingent, have paid nothing, may never pay, and have an "unknown" value that "won't be

determined until each case is either settled or tried to a verdict." Dkt #78; Dkt. #88; Ex. 29; Ex. 28;

Ex. 26 at 16:6-17, 25:19-26:19, 22:18-23:7.

For cash flow, Debtor also has no prospect of positive cash flow:

1.  On the Opioid Cases, which are Collateral, Debtor testified that it **may** receive **some** fees by December 2023. Ex. 26 at 22:18-23:7. December came and went, and Debtor has received **zero** proceeds from this account.

2.  Only $7,000 in "fee income" and $4,747 in "billable expense income" have been received by Debtor from two contingency fee accounts since the Petition date. *See* Dkt #97; Dkt #88; Dkt #78; Dkt #71.

3.  Debtor has no firm estimate of how much or when its remaining cases will pay. *Id.* at 16:6-17, 25:19-26:19, 22:18-23:7.

4.  Between August 31, 2023 and December 31, 2023, the only non-case revenue Debtor received was $15,250 in rent, $11,250 of which is only paid quarterly. *Id.* at 23:15-24:4; Dkt. #71, 78, 88, 97.

5.  Other than speculative case receipts, this small rent, and a potential health insurance reimbursement, Debtor has no other source of projected revenue. Ex. 26 at 36:5-13.

6.  In addition to $22,180 in monthly general and administrative expenses (e.g., rent, payroll), Debtor estimates $35,000 in case expenses between now and June 2024. *Id.* at 27:25-28:25.

7.  Debtor has no cash-flow estimates and will have $0 in short order absent spending cash collateral or contributions from principals. *Id.* at 37:1-22.

8.  Debtor assumes zero payments to Virage as a secured creditor, has made zero payments to Virage since 2020, and has no plans to pay unsecured creditors. *Id.* at 37:23-38:10; Ex. 9.

9.  Debtor converted $3,061,562.06 in Case Proceeds and "would have been out of business years ago if" Debtor paid "60%" of Case Proceeds to Virage as required. Ex. 9; Ex. 18.

Debtor's actual "plan" is: (1) Weston will "retire" in "about a year," (2) Debtor will **not**

hire another lawyer, and (3) as has been the case since **1986**, Sacks will do zero litigation work:

```
14        Q.  Mr. Weston, when do you intend to retire from
15    the practice of law?
16        A.  A good question.  I have told Andrew that I
17    would like to retire in about a year.  We have -- we
18    have a lease that goes a little bit beyond that.  We
19    have some cases that need to be handled during the
20    interim, but that's my goal.
```

```
15        Q.  Does Sacks Weston, LLC, currently have any
16   plans to hire new lawyers to replace you at the firm?
17        A.  Not so far as I know.
18        Q.  Could Sacks Weston, LLC, at the moment afford
19   to hire a new lawyer to replace you at the firm?
20        A.  I doubt it.

21        Q.  To your knowledge, when was the last time that
22   Mr. Sacks wrote a legal brief that was filed with the
23   Court?
24        A.  When was the last time he did what?
25        Q.  The last time that Mr. Sacks filed, let's say,
```

```
1    a motion, wrote a motion that was filed with the Court?
2         A.  I would guess that that would have been 1985 or
3    '86.
4         Q.  How about the last time that Mr. Sacks took a
5    deposition?
6              When would that have been?
7         A.  I know that he assisted me on a deposition in
8    the Zena Jordan case during that same time frame, '85 or
9    '86.
10        Q.  When was the last time to your knowledge that
11   Mr. Sacks argued a hearing in a court?
12        A.  Same -- same time frame, those two years.
13        Q.  And when to your knowledge was the last time
14   that Mr. Sacks tried a case in a court of law?
15        A.  I don't think Andrew has ever tried a case.
```

Ex. 17 at 15:14-17:12; Ex. 26 at 38:16-18.

### G. G. Debtor contradicts its cash-collateral briefing, withdrew its final cash-collateral motion, and violated the interim cash-collateral order.

At the September cash-collateral hearing, Debtor represented to this Court that it would be "ethically" obligated to transfer its 16 cases to another firm and would lose its fees if the Court did not approve this budget. Ex. 27 at 4:18-5:18, 21:8-21. Debtor later admitted this representation was false because "no client or co-counsel has threatened to terminate Sacks Weston LLC" and any such termination due to Debtor's operations or budget is "completely speculative." Ex. 26 at 32:19-33:4. Far from needing to use Virage's collateral to pay for unnecessary expenses, Debtor also admitted there is "no legal" or "practical reason" why Sacks and Weston could not pay the

requested $22,180 in monthly expenses from their $12 million in personal assets. Dkt. 37; Ex. 26 at 30:1-5, 31:19-25; Ex. 12; Ex. 19. Unsurprisingly, after these admissions, Debtor withdrew its cash-collateral motion, telling Virage that the principals would self-fund Debtor until the bankruptcy was resolved. Dkt. 69; Ex. 34. Nevertheless, Debtor improperly spent $1,592.85 on an unapproved accountant. Dkt. 78 at 14.

Now that crying wolf about losing its clients failed, Debtor flip flops again and claims it **plans** to intentionally lose its clients by "transition[ing] some or all of its cases to another law firm." Dkt. 93 at ¶ 3. This plan thus treats the Court's question of "how this law firm is operating going forward if no one is practicing" as a trick question to which the answer is "we will let another law firm practice for us." *See* Ex. 27 at 13:8-10. This trick simply confirms that Debtor has no chance of reorganization, this Chapter 11 case has been a mere delay tactic, and dismissal is appropriate. The only alternative is to convert this case into a liquidation, transfer the cases—as the Debtor now purports to want to do—and pay off estate's creditors with whatever value can be obtained.

### III.    ARGUMENT AND AUTHORITIES

#### A. Virage's security interest in Debtor's contingency fee cases is an interest in "accounts" and the "proceeds" of those accounts under the U.C.C.

As a threshold matter, Virage's security interest is indisputably an interest in "accounts" and the "proceeds" of those accounts as defined by the U.C.C. *See, e.g.*, *Stanziale v. Finova Capital Corp. (In re Tower Air, Inc.)*, 397 F.3d 191, 196–98 (3d Cir. 2005) (finding in the insurance context that money received pursuant to a right to payment constituted "proceeds" on "accounts" under the UCC and rejecting argument "that § 9–306(a) limits the *definition* of "proceeds" to encompass only those proceeds that entirely *replace* collateral") (emphasis in original).

– 10 –

Previously, Debtor repeatedly and incorrectly argued that Virage's interest is not in "accounts" but instead is in unperfected "deposit accounts." *See* Dkt. 17; Ex. 30 at 17:7-10 (responding to Virage's correct characterization of the collateral as accounts by saying, "I think counsel's characterization of the collateral as accounts is just, frankly, incorrect. **It's not accounts.**"). Now, without directly correcting these prior misstatements to the Court, Debtor appears to concede that Virage's security interest covers the contingency fee accounts and the proceeds generated from those accounts. Mot. at ¶¶ 30 ("It is not in dispute that the Firm's prepetition cases are the Debtor's prepetition property, to which a valid and properly perfected security interest in the cases would attach."), 35 ("the Firm's right to payment on such a completed contingency-fee case would be akin to an account receivable—for which there is no dispute that a creditor's prepetition lien would attach.").

There is nothing unique about Virage's security interest in Debtor's contingency fee accounts being predicated upon the rights of payment under contingency agreements with the law firm's clients. Indeed, the Eastern District of Pennsylvania has specifically reviewed just such security interests and determined that an interest in a right to payments under a contingency fee agreement constitutes an interest in an "account" as defined by the U.C.C. *U.S. Claims, Inc. v. Flomenhaft & Cannata, LLC*, 519 F. Supp. 2d 515 (E.D. Pa. 2006), on reconsideration in part (Feb. 26, 2007) (finding "the [contingency] fee contracts constituted 'accounts' under the Uniform Commercial Code") (collecting cases). This holding is consistent with how circuit courts discuss secured creditor's interests in contingency fee cases. *See, e.g.*, *In re Holstein Mack & Klein*, 232 F.3d 611, 612 (7th Cir. 2000) (discussing bank's security interest in legal fees to be earned from personal injury and class action suits as an interest in the firm's "receivables"); *Cadle Co. v. Schlichtmann*, 267 F.3d 14, 20–21 (1st Cir. 2001) ("Cadle's security interest in the firm's accounts

receivable extends to proceeds from the Groton matter including the contingency fee at issue.").

Accordingly, Virage's interests in Debtor's contingency fee accounts were created when the clients

signed an engagement with Debtor, and Virage's security interest attaches to the proceeds of

whatever Debtor earns on those contingency fee accounts at the time a settlement is paid out.

Specifically, Virage's security interest covers:

(a) Accounts and General Intangibles (including Payment Intangibles) arising out
of any Eligible Case or Eligible Collateral Case (as defined in the Loan Agreement)
and any other property constituting Case Proceeds (as defined in the Loan
Agreement);

(b) Any Assigned Accounts into which any of the Collateral described in clause (a)
above is deposited; and

(c) Proceeds and products of the foregoing, and all insurance of the foregoing and
proceeds thereof;

Ex. 25, § 1. Thus, the agreement itself states that Virage's interest is in "accounts," and also that

the security interest extends to "proceeds" of those "accounts." *Id.*

Virage's security interest covers all contingency fee accounts currently possessed by

Debtor, including both those the Debtor had at the time the Loan Agreement was executed, as well

as all contingency fee accounts acquired thereafter. *See* Ex. 5, at Definitions ("Eligible Collateral

Case" means "all of Borrower's cases or claims in which the Borrower has been retained or is

subsequently retained as legal counsel or otherwise has a legal interest.").

Accordingly, at least based on Debtor's most recent disclosures, Virage's security interest

covers the following pre-petition contingency fee accounts and extends to 100% of the proceeds

received from each case:

- *Delva v. 5 Lee Brothers Corp*., No. 2021-09417 (C.P. Montg.).

- *Hudspeth v. Kircher Trucking, LLC*, et al., No. CV-2021-008598 (C.P. Del.).

- *Gray v. Ritz, et al*., No. 2925 August Term 2020 (C.P. Phila.).

- *Gray v. Briad Wenco LLC*, No. 1747 November Term 2021 (C.P. Phila.).

- Stewart, Anthony, file # 211273

- *Howell v. Bernick, et al.*, No. 2020-14748 (C.P. Montg.)

- *Beuter v. Justenuff Jack LLC*, No. 2019-18240 (C.P. Montg.)

- Sendent Energy, no file number

- *Z&R Cab, LLC v. Phila. Parking Authority*, No. 1582 CD 2022 (Pa. Cmnwlth.).

- *City of Phila. v. Allergan PLC*, No. 2718 January Term 2018 (C.P. Phila.), now coordinated as *Delaware County PA v. Purdue Pharma LP, et al.*, Coordinated Proceedings No. 2017-008095 (C.P. Del.).

- *Commonwealth of Pa. v. Purdue Pharma LP, et al.*, No. 5594 January Term 2018 (C.P. Phila.), later coordinated as *Delaware County PA v. Purdue Pharma LP, et al.*, Coordinated Proceedings No. 2017-008095 (C.P. Del.), now on appeal to Commonwealth Court as No. 283 MD 2022 (Pa. Cmnwlth.).

- *Pryce v. Progressive Corporation*, No. 1:19cv1467-(FB)(RER) (E.D. N.Y.).

- *Lanzillotta v. GEICO*, No. 19-cv-1465 (E.D. N.Y.).

- *Cardenas, Admx., v. State Farm Mutual Automobile Insurance Company*, No. 7:21-cv-00224-KMK (S.D. N.Y.).

- *Brown v. The Allstate Corporation*, et al., No. 22-cv-5096 (E.D. N.Y.).

- *Lazazzaro v. The Hershey Company*, 2:22-cv-07923 (E.D.N.Y),

- *Grausz v. The Hershey Company*, 3:23-cv-00028 (S.D. Cal.),

- *Kell v. Lily's Sweets, LLC & The Hershey Company*, 1:23-cv-00147 (S.D.N.Y).

**B. Section 552 does not cut off Virage's security interest in proceeds of contingency fee accounts.**

In part to serve the "fresh start" principle of bankruptcy reorganization, Section 552(a) cuts off a secured creditor's "after-acquired" floating lien at the petition date. *See* 11 U.S. Code § 552(a); *see also Local Loan Co. v. Hunt*, 292 U.S. 234, 243 (1934) (origin of "fresh start" principle, forbidding "the creation of an enforceable lien, . . . [not proceeds of preexisting lien] but

solely as the fruit of the subsequent labor of the bankrupt"). Given this harsh treatment towards pre-petition lenders, Section 552(b) specifies that, consistent with *Local Loan* and the UCC, the "proceeds" of pre-petition collateral remain subject to the secured creditor's lien. 11 U.S. Code § 552(b)(1) ("[S]uch security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law.").

The Fourth Circuit's opinion, *In re Bumper Sales*, is instructive. 907 F.2d 1430 (1990). There, the question concerned the treatment of inventory that was acquired post-petition, and over which a committee attempted to say was not subject to the secured creditor's security interest. *Id.* at 1436. As a threshold matter, the court first determined that the U.C.C.'s definition of proceeds applied and, accordingly, that "'Proceeds' includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds... money, checks deposit accounts, and the like are 'cash proceeds.'" *Id.* at 1437 (alterations in original) (quotation omitted) ("[W]e hold that the UCC's definition and treatment of proceeds applies to Section 552 of the Bankruptcy Code."). The court then posed the following questions to analyze whether post-petition assets were after-acquired property (cut off by Section 552) or proceeds (subject to security interest):

- "First, is there a pre-petition security agreement that by its terms extends to [debtor's] pre-petition inventory, accounts and proceeds?

- Second, did [debtor] receive the proceeds of the pre-petition inventory and accounts after the filing of the petition?

- Third, is [debtor's] post-petition inventory second generation proceeds of pre-petition inventory and accounts, and are [debtor's] post-petition accounts proceeds of post-petition inventory?"

*Id.* at 1436–37. The court then answered all questions in the affirmative based on the factual record before it, finding that the post-petition inventory remained covered by the creditor's security interest even when the inventory was acquired post-petition. Importantly, because "Section

9-306(1) [of the UCC] states that proceeds includes the proceeds of proceeds" the court "h[e]ld that [secured creditor] has a properly perfected security interest in [debtor's] post-petition inventory as well as in any post-petition accounts and cash generated therefrom." *Id.* The court also specifically looked at whether this result was inequitable and found that it "will not thwart the 'fresh start' ambitions of the Code, because debtor-in-possession will still be able to encumber assets that are not proceeds of pre-petition collateral." *Id.* at 1438.

The facts as analyzed by *In re Bumper Sales* were simplified in so far as it was uncontested that all of the funds used to purchase post-petition inventory were proceeds of the secured creditor's collateral. *Id.* at 1437 ("But there is no doubt that the cash proceeds are identifiable, because the parties have stipulated that Bumper Sales used only these cash proceeds to finance its operations during bankruptcy."). But the inquiry remains the same even where cash collateral is commingled with other non-proceeds cash. In *In re Skagit Pacific Corp.*, the Ninth Circuit evaluated a situation where there were "pre-petition balances outstanding on various [Debtor] accounts at the time of the bankruptcy filing, and were paid post-petition." 316 B.R. 330, 336 (B.A.P. 9th Cir. 2004). The court stated that "[t]here is no question that money collected on these accounts constituted proceeds of [creditor's] pre-petition security interest." *Id.* It then looked at extent of the security interest, as when those proceeds were used "to pay for such expenses as utilities, supplies, wages, and operations . . . new accounts receivable were created." *Id.* The court termed these as new accounts as "second and third-generation proceeds" that remained covered by the creditor's security interest if they could be adequately traced. *Id.*

Applied to Debtor's contingency fee accounts, all Section 552(a) would do is cut off Virage's automatic security interest in **new** contingency fee accounts **acquired after the Petition date** so long as Debtor did not acquire those new accounts using proceeds of Virage's pre-petition

contingency fee accounts (i.e., all 16 of Debtor's current cases). *See In re Bumper Sales*, 907 F.2d at 1439 ("As a result, after-acquired property will frequently qualify as second-generation proceeds, as when a dealer sells an appliance and reinvests the cash proceeds in new inventory.") (quotation omitted). This may occur, for example, if Debtor used Virage's cash collateral to pay a referral fee to another lawyer in exchange for a new case. In such an instance, the new contingency fee account created by that transaction would be covered by Virage's security interest as second generation proceeds. Conversely if one of Debtor's attorneys went out and acquired a new case "solely as the fruit of [his] subsequent labor," then Virage's security interest would not extend to that new account. *Local Loan Co.*, 292 U.S. at 243. Because Debtor has zero post-petition cases, the Court does not need to rule on the status of any post-petition accounts.

### C. The First Circuit has specifically analyzed Section 552's application to contingency fee accounts and held that Section 552 does not cut off proceeds even when work continues on the case in question post-petition.

Debtor seeks to create an exception to the plain language of Section 552 that provides that a "security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case." 11 U.S. Code § 552(b)(1). Debtor seeks to instead cut off Virage's interest in the proceeds of the contingency fee accounts because a portion of work might be completed post-petition. Contrary to Debtor's brief, there is nothing unique about applying Section 552 to a secured creditor's interest in contingency fee accounts. *Cadle*, 267 F.3d at 20–21. Debtor is not the first to attempt this argument, which the First Circuit specifically rejected in *Cadle Co. v. Schlichtmann*. *See id*. The First Circuit first identified that "Section 552(b)(1) applies because [secured creditor's] security interest in the firm's accounts receivable extends to proceeds from the *Groton* matter including the contingency fee at issue." *Id.* at 20. It then considered that the attorney's "post-bankruptcy work on the *Groton* matter no doubt contributed to the

– 16 –

consummation of the settlement." *Id.* at 19. Yet, despite the application of post-petition labor, the First Circuit held that "[b]ecause the security agreement covered the firm's accounts receivable—property acquired before the bankruptcy proceedings—and the resulting security interest attached to the proceeds known as the Groton fee, this security interest attached to the Groton fee received by Schlichtmann post-bankruptcy." *Id.* at 20.

*Cadle* applies here directly. Virage has a similar secured interest in Debtor's contingency fee accounts. Some of these cases may also require some post-petition labor to consummate the settlements or to receive the fees already allocated to Debtor. Because Virage's interest in Debtor's contingency fee accounts pre-dates Debtor's petition, Virage's security interest in the proceeds of those accounts that is received post-petition is not affected by any post-petition labor performed by Debtor's principals.

**D.  Sacks Weston is not a restaurant and Virage's security interest is not in inventory.**

Because it cannot avoid the application of *Cadle* to Virage's interest in the proceeds of Debtor's contingency fee accounts, Debtor cites no caselaw for the proposition that Virage's security interest does not extend to case revenue that results from work performed post-petition. Instead, Debtor appeals to caselaw evaluating the proceeds of the sale of ***inventory***—not ***accounts***—in the context of a restaurant. Mot. at 6 (citing *In re Cafeteria Operators, L.P.*, 299 B.R. 400, 405 (Bankr. N.D. Tex. 2003). This case correctly stated that "revenues generated post-petition ***solely*** as a result of the debtor's labor are not subject to a prepetition lender's security interest." *Id*. (emphasis added). Here, by contrast, Debtor concedes that, for each of the 16 pre-petition cases, Debtor did some or all of the work pre-petition. *See* Ex. 28.

The *In re Cafeteria* court evaluated the specific factual context where a secured creditor sought its interest in the proceeds of inventory that formed part of a restaurant's post-petition

accounts receivables. In the restaurant context, each new customer creates a new, post-petition accounts receivable, and the *In re Cafeteria* court determined that "[r]estaurant revenues are primarily the fruit of Debtors' labor; however, they do contain some component of proceeds of inventory. Thus, the cash generated from the sale of the inventory is Bank Group's cash collateral." *Id.* at 408. Accordingly, because the secured lender's interest was limited to inventory, the Court segregated the restaurant's post-petition accounts receivables to that which was directly traceable to the pre-petition inventory covered by the secured creditor's security interest and the portion of the accounts receivable attributable towards service and labor of post-petition customers. *Id.* at 410 (limiting "the [secured creditor's] interest in Debtors' post-petition cash to the value of the Debtors' inventory").

Unlike what the *In re Cafeteria* court evaluated, Sacks Weston is not a restaurant and the collateral that Virage has an interest in the proceeds of does not consist of inventory. Here, there are no new accounts (hungry customers who owe money for 100% post-petition services) where the revenue derived from serving the new accounts is commingled with proceeds of inventory. Instead, Virage's interest is solely in the pre-petition contingency fee accounts to which its security interest covers 100% of the proceeds regardless of when the fee is paid. As the *Cadle* court found, for this specific type of collateral, Virage's security interest is not cut off by Section 552 of the bankruptcy code. 267 F.3d at 20–21. And, consistent with *In re Cafeteria*, if Debtor obtained new contingency fee accounts (without using the proceeds of Virage's collateral), which settled, then Virage's security interest would not cover all of Debtor's accounts receivable but only the portion of the accounts receivable that was attributable to the pre-petition contingency fee accounts.

**E.   *ACF 2006 Corp. v. Conour* is a red herring that approvingly cites *Cadle*.**

Attempting to avoid *Cadle's* application, Debtor cites *ACF 2006 Corp. v. Conour*, an unpublished decision that deals with a wholly unrelated situation where an employee of a law firm left the firm, a client fired the law firm, and then the law firm's creditor attempted to recover all or part of the fee from the client's new firm. 2015 WL 417553 (S.D. Ind. Jan. 30, 2015). Aside from confirming that "contingency fee contracts and fees pending in contingency fee cases are accounts for purposes of Article 9," this case is a red herring with no application to Section 552 of the bankruptcy code. *Id.* at *5.

Virage does not dispute that its interest in the contingency fee accounts is no greater than Debtor's interest. And if a client were to terminate their relationship with Debtor and hire another law firm to continue litigating its case, this may reduce the dollar value of any proceeds received by Debtor, and by extension, Virage. However, the reduction in the dollar value of the proceeds would not change the fact that Virage retains a security interest in 100% of the proceeds received by Debtor for its remaining interest in the case.

What's more, the *Conour* court specifically analyzed *Cadle*. The *Conour* court did not dispute *Cadle's* holding, but instead distinguished it factually. In *Cadle* the lawyer seeking to avoid the security interest was an **equity partner**, who assigned the case to another former partner in an effort to avoid the security interest. By contrast, in *Conour* the lawyer in question was just an employee. 2015 WL 417553, at *7. Critically, in *Conour* **the clients** "voluntarily chose to terminate their relationship with the Conour Firm and establish a new relationship with the Ladendorf Firm." *Id.* In other words, it was the client's termination of attorney-client representation that reduced the debtor firm's interest in the contingency fee account to a quantum

meruit recovery of work already performed; the secured creditor's security interest in the reduced proceeds of that account was unaffected.

The only application of *Conour* to this case is to address a hypothetical of what might happen to Virage's interest if one of Debtor's clients terminates its representation and takes its case elsewhere. The court can address this situation if it ever comes to pass.

If, as urged by Virage, Debtor enters into a liquidating plan and transfers the cases to another law firm, this still would not implicate the quantum meruit discussion from *Conour*. Instead, *Cadle* makes clear that having another lawyer take over the representation has no effect on the secured creditor's interest in the proceeds of the contingency fee case accounts.

**F.  The equities do not support disregarding the U.C.C.**

Section 552 has a very limited carve out for situations where the equities are such that it would be patently unfair for a secured creditor's interest to continue post-petition. This is not one of those cases.

The Third Circuit confined the equity exception to Section 552 "to prevent an oversecured lender from receiving a windfall by taking assets that would otherwise go to rehabilitating the debtor." *In re Tower Air, Inc.*, 397 F.3d 191, 205 (3d Cir. 2005). Here, Virage is not oversecured, but, based on the Debtor's estimates, is ***under***-secured, with its collateral worth approximately $3.6 million compared to Virage's claim of $14,498,570.08. *Compare* Ex. 28 *with* Ex. 31 (Virage's Proof of Claim). As stated above, the "fresh start" principle is not implicated by Section 552, which already takes the proper balance into account. *See In re Bumper Sales, Inc.*, 907 F.2d at 1438 ("Finally, this section will not thwart the 'fresh start' ambitions of the Code, because the debtor-in-possession will still be able to encumber assets that are not proceeds of pre-petition collateral."). Thus, there is no basis to equitably reduce Virage's security interest even further.

Furthermore, the Debtor's pre-petition conduct has been anything but equitable. The state court has already determined that the Debtor was in process of attempting to fraudulently transfer its opioid cases in violation of Virage's security interest. Ex. 4. It also determined that principal Andew Sacks engaged in fraudulent transfers of personal assets to avoid his personal guarantee to Virage. *Id*. Then, after the Temporary Injunction Order required Debtor to turn over certain proceeds of Virage's collateral, the Debtor spent a significant portion of those proceeds and then filed this bankruptcy proceeding to avoid Virage's enforcement of the order. This is above and beyond the $3,061,562.06 worth of Virage's collateral that the Debtor converted prior to the litigation. Ex. 9.

**G. All other cases cited by the Debtor do not change the analysis.**

Not one of the cases that the Debtor cites in its motion would act to limit Virage's security interest through the application of Section 552:

- *Smoker v. Hill & Assocs*., 204 B.R. 966, 974 (N.D. Ind. 1997):

    o Court approves bankruptcy court finding that secured creditors security interest extended to commissions from insurance contracts that became payable post-petition.

- *In re Tex. Tri-Collar, Inc*., 29 B.R. 724, 726–27 (Bankr. W.D. La. 1983):

    o Held that post-petition accounts remained the secured creditor's collateral if it was "proceeds, product, offspring, rents or profits" prepetition property subject to secured creditor's security interest.

- *In re Skagit Pac. Corp*., 316 B.R. 330, 336 (B.A.P. 9th Cir. 2004):

    o Held that account receivable earned pursuant to post-petition contract was cut off from secured creditor's security interest but that when contract was acquired or performed using proceeds of secured creditors collateral then the security interest continued to cover second or third generation collateral that was traceable proceeds.

- *In re Delco Oil, Inc*., 365 B.R. 246, 250 (Bankr. M.D. Fla. 2007):

- o   Court found that secured creditor was entitled to relief from the automatic stay as Debtor's post-petition cash was traceable to prepetition collateral and any labor used to generate the funds was paid for using cash collateral.

- *In re Shree Meldikrupa Inc.*, 2016 Bankr. LEXIS 159 (Bankr. S.D. Ga. Jan. 15, 2016):

  - o   Held that the proceeds of inventory would constitute cash collateral but for the unperfected nature of the security interest.

Accordingly, when Debtor argues that "[a]ny revenue received by the Firm in excess of that prepetition value and attributable to the value-enhancement of its attorneys' postpetition labor is received by the Debtor free and clear of any prepetition liens under § 552," it has no case citation. Mot. at ¶ 20. This statement is made *ipse dixit* and is contrary to law.

### H.  The Debtor's proposed bifurcation procedure is premature.

Debtor's proposed procedure to determine the portion of contingency fee account proceeds subject to Virage's security interest is unnecessary as Section 552 does not act to reduce Virage's security interest in any way.

Debtors have provided no evidence that they have performed any post-petition work, or that any work performed post-petition actually increases the cases' value. Until Debtor provides concrete evidence of work performed, this motion is at best premature. This is particularly important given that Debtor has only two lawyers—one of which does no legal work. Ex. 17 at 16:21-17:12. Furthermore, although Virage has requested fee statements or reports of hours worked, Debtor has not provided any. *See* Ex. 34. Indeed, Debtor has specifically stated that it does not keep time entries for personal injury matters. Ex. 26 at 32:6-11

For example, Debtor states without evidence that "the Firm has taken its prepetition collateral and added valuable estate resources—postpetition attorney labor—thereby transforming the prepetition collateral and increasing its value." Mot at ¶ 37. But for Debtor's opioid cases it is undisputed that the cake is already baked, and Debtor will receive the same 6.25% fee even if it

performs no additional work on the matters. Ex. 32 (co-counsel agreement). As Sacks put it: "We get a guaranteed fee if we do nothing." Ex. 33 at VCM_SW0000011. Debtor provides no evidence that its fee arrangements on its other class-action contingency fee accounts are any different. *See* Ex. 35 at 45:7-17.

Additionally, Debtor's unsworn statements regarding its post-petition efforts made in its Motion are contrary to its representations made elsewhere. In its motion, Debtor refers to the recent receipt of "$7,000 in attorneys' fees" in proceeds on two accounts covered by Virage's security interest that it received post-petition. Mot. ¶ 50. Without providing any fee statements—which it admits it does not record (Ex. 26 at 32:6-11)—it claims that "Debtor maintains that some portion of both fees were earned postpetition." *Id.* Yet, Debtor has already disclosed these cases, and stated that 100% of the work on them was completed pre-petition:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **PRE-PETITION/POST-PETITION FEE ANALYSIS** | | | | | | | |
| CASE TYPE | ANTICIPATED RANGE OF RECOVERY | FEE CALCULATOR | ANTICIPATED RANGE OF RECOVERY FOR FIRM | PERCENTAGE OF CASE COMPLETED | EARNED FEE AS OF PETITION DATE | PERCENTAGE TO BE COMPLETED | TO BE EARNED POST-PETITION |
| 8. Personal Injury | $2,900 | no fee | $2,500 costs | 100% | $2,500 costs | 0% | $0 |
| 9. Personal Injury | $15,000 | $6060.41 fee and costs | $6,060 | 100% | $6060.41 fee and costs | 0% | $0 |

Ex. 28. Debtor's procedure is also incorrect. At best, Virage's security interest would cover all post-petition fees with a minor carveout for the reasonable and necessary hourly rate of work performed entirely post-petition. *See Santalucia v. Sebright Transp., Inc.*, 232 F.3d 293, 298 (2d Cir. 2000). Debtor cannot simply try to finagle a 50-50 or other large split simply by speculating about the value of post-petition work in the outcome of a contingency case.

## IV.    CONCLUSION

For the reasons stated above, Virage respectfully requests the Court deny Debtor's Motion and strictly enforce Virage's continuing security interest in Debtor's contingency fee accounts and the proceeds from those accounts.

Dated: February 6, 2024                    Respectfully Submitted,

                                           **AHMAD, ZAVITSANOS & MENSING, PLLC**

                                           */s/ Cameron Byrd*
                                           Todd Mensing
                                           Texas Bar No. 24013156
                                           Cameron Byrd
                                           Texas Bar No. 24097444
                                           Alexander M. Dvorscak
                                           Texas Bar No. 24120461
                                           Justin Kenney
                                           Texas Bar No. 24126702
                                           1221 McKinney Street, Suite 2500
                                           Houston, Texas 77010
                                           Telephone: 713-655-1101
                                           Facsimile: 713-655-0062
                                           tmensing@azalaw.com
                                           cbyrd@azalaw.com
                                           advorscak@azalaw.com
                                           jkenney@azalaw.com

                                           George Bochetto, Esquire
                                           John A. O'Connell, Esquire
                                           **BOCHETTO & LENTZ, PC**
                                           1524 Locust Street
                                           Philadelphia, PA 19102
                                           Telephone: (215) 735-3900
                                           gbochetto@bochettoandlentz.com
                                           joconnell@bochettoendlentz.com

                                           Lewis R. Landau
                                           Attorney at Law
                                           22287 Mulholland Hwy., # 318
                                           Calabasas, CA 91302
                                           Voice & Fax: (888)822-4340
                                           lew@landaunet.com

                                           **ATTORNEYS FOR VIRAGE SPV 1 LLC**

## CERTIFICATE OF SERVICE

       I hereby certify that on February 6, 2024, a true and correct copy of OBJECTIONS TO MOTION FOR (I) A DETERMINATION REGARDING THE APPLICABILITY OF 11 U.S.C. § 552 TO LEGAL FEES EARNED POSTPETITION AND (II) APPROVAL OF AN EXPEDITED PROCEDURE BY WHICH THE DEBTOR'S CASE REVENUES SHALL BE CHARACTERIZED AS AND BETWEEN PREPETITION AND POSTPETITION EARNINGS was served on the following counsel of record via CM/ECF system:

       David B. Smith, Esquire
       Nicholas M. Engle, Esquire
       Smith Kane Holman, LLC
       112 Moores Road, Suite 300
       Malvern, PA 19355
       Telephone: (610) 407-7215
       Facsimile: (610) 407-7218

                              */s/ Alexander M. Dvorscak*
                              Alexander M. Dvorscak