UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | CHAPTER 11 |
| | : | |
| SACKS WESTON LLC | : | Case No. 23-12540 (PMM) |
| | : | |
| Debtor | : | |
| | : | |

# DISCLOSURE STATEMENT

**Submitted by Debtor Pursuant To 11 U.S.C. § 1125**

**NOTICE TO CREDITORS AND PARTIES IN INTEREST:**

**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED TO ALL CREDITORS AND PARTIES IN INTEREST. THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY AFFECT YOUR DECISION TO ACCEPT OR REJECT THE CHAPTER 11 PLAN FILED BY THE ABOVE-CAPTIONED DEBTOR DATED AS FEBRUARY 21, 2024, AS IT MAY BE FURTHER MODIFIED OR AMENDED FROM TIME TO TIME. ALL CREDITORS AND PARTIES IN INTEREST ARE URGED TO READ THIS DISCLOSURE STATEMENT CAREFULLY.**

SMITH KANE HOLMAN, LLC
Nicholas M. Engel, Esquire
David B. Smith, Esquire
112 Moores Road, Suite 300
Malvern, PA 19355
(610) 407-7215 Phone
nengel@skhlaw.com
*Counsel to Debtor-In-Possession*

Date:   February 21, 2024

Sacks Weston LLC (the "Debtor") submits as proponent, this Disclosure Statement (the "Disclosure Statement") in connection with its Chapter 11 Plan (the "Plan"), pursuant to Chapter 11 of the United States Bankruptcy Code (the "Code"). A copy of the Plan was filed on February 21, 2024 (any capitalized terms not defined herein shall have the meaning ascribed to such terms in the Plan).

## I. INTRODUCTION

The Debtor filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code on August 25, 2023 (the "Petition Date") and has continued as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Code.

On February 21, 2024, the Debtor filed the Plan seeking to address its unsecured creditors so as to maximize the return to unsecured creditors as follows:

First, the Debtor is litigating the amount of, and the extent of any collateral securing, the claim of its putative secured creditor, Virage. To the extent successful in this litigation, the Debtor will provide a return to its unsecured creditors from the proceeds of its cases that existed as of the Petition Date.

Second, the Debtor is proposing to devote for the benefit of its unsecured creditors all of its income, after payment of its ordinary expenses, for the period commencing upon the Effective Date of its Plan and continuing for a period of three years. The principals of the Interest holder (i.e., the sole owner of membership interests in the Debtor) will not receive compensation as part of the ordinary expenses to be paid during this time period to increase the net amount payable to creditors.

Third, the holder of an Interest in the Debtor will make payments for the benefit of unsecured creditors in the aggregate amount of $75,000 as a guaranteed return above and beyond all other mechanisms of payment. In addition, the Interest Holder will also fund the payment of Administrative Claims, which are expected to be at least $150,000 through the confirmation of the Plan.

Finally, the Interest holder in the Debtor will subordinate debt in the principal amount of $688,321.41 to the debt of all other unsecured creditors.

On February 21, 2024, the Debtor filed this Disclosure Statement as containing adequate information as required by the provisions of the Code.

## II. PRELIMINARY STATEMENT AND SOLICITATION

As a creditor involved in the Debtor's bankruptcy case, you should take the time to vote on the proposed Plan, which, if confirmed, will affect your economic interest in the case. Before casting your ballot, it is important that you be properly informed about the nature of the case and the workings of the proposed Plan and its consequences. The Disclosure Statement has been approved by the United States Bankruptcy Court as containing adequate information to enable

1

you to make an informed judgment about the Plan.  The Debtor urges you to review the Disclosure Statement and the Plan, consult with your own legal counsel or other advisors if you think it is appropriate and, for the reasons that follow, vote in favor of the Plan.  The Plan will accomplish its objectives through the repayment of certain of the Debtor's obligations mainly through the Debtor's future earnings.  The Debtor believes that creditors will receive a higher overall return under the provisions of the Plan than other alternatives, particularly liquidation of all of the Debtor's assets—which would provide no recovery for unsecured creditors if those assets are found to be fully encumbered by a properly perfected security interest in favor of Virage.

III.   **PURPOSE OF THE DISCLOSURE STATEMENT AND PROVISIONS FOR VOTING AND CONFIRMATION**

   A.   PURPOSE

The Debtor provides this Disclosure Statement, pursuant to the requirements of Section 1125 of the Code, in order to provide to the holders of all Claims against the Debtor adequate information about the Debtor and the Plan, so that they may make an informed judgment with respect to the merits of the Plan.

This Disclosure Statement does not purport to be a complete description of the Plan, the financial status of the Debtor, the applicable provisions of the Code, or other matters that may be deemed significant by certain creditors, and parties-in-interest.  This Disclosure Statement is an attempt to set forth, in reasonable detail, information that will enable a creditor to make an informed judgment with respect to the Plan.  The Disclosure Statement necessarily involves a series of compromises between "raw data," the legal language in documents or statutes, and the considerations of readability and usefulness.  For further information, you may desire to examine the Plan directly (a copy of which accompanies this Disclosure Statement), and/or consult with your legal and financial advisors.  The description of the Plan herein is provided only as a summary and it is recommended that all creditors and parties-in-interest review the Plan, the balance of this Disclosure Statement, and the other documents and information referenced herein, in order to obtain more complete information.  Approval by the Bankruptcy Court of the Disclosure Statement is not an approval of the Plan.

Except as set forth in this Disclosure Statement, no representations concerning the Debtor or its assets or the Plan are authorized, and any such representations are not to be relied upon in arriving at a decision with respect to the Plan.  Any representation made to secure the acceptance or rejection of the Plan other than as contained in this Disclosure Statement should be reported to Debtor's counsel.

IN ACCORDANCE WITH UNITED STATES TREASURY CIRCULAR 230, BE ADVISED THAT: (A) ANY DISCUSSION OF TAX MATTERS IN THIS DOCUMENT IS NOT TAX ADVICE AND IS NOT INTENDED TO BE USED, AND CANNOT BE USED, FOR PURPOSES OF AVOIDING PENALTIES IMPOSED UNDER THE UNITED STATES INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS

ADDRESSED IN THIS DOCUMENT; AND (C) A TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

The information contained in this Disclosure Statement has been supplied by the Debtor. Based on the information made available, Debtor's counsel has no information to indicate that the information disclosed in this Disclosure Statement is inaccurate. While every effort has been made to provide the most accurate information available, neither the Debtor, nor Debtor's counsel, is able to state definitely that there is no inaccuracy in this Disclosure Statement or that future events may not render the information contained in this Disclosure Statement inaccurate.

Please be advised that the Debtor has attempted to provide only a general overview regarding its background and financial difficulties, and not to provide a detailed account of all events, actions, and circumstances that have contributed to those difficulties.

The terms and definitions contained in the Plan also apply to the Disclosure Statement, and Claimants are urged to read the Plan in its entirety in conjunction with the review of the Disclosure Statement.

 B. VOTING PROVISIONS

  1. <u>General</u>

Except for Claimants holding Administrative Claims, Priority Tax Claims or a Claim in an unimpaired class, every holder of a Claim is entitled to vote to accept or reject the Plan, provided that either: (a) its Claim has been scheduled by the Debtor and such Claim is not scheduled as a disputed, contingent or unliquidated claim; or (b) it has filed a timely Proof of Claim, unless its Claim has been disallowed for voting purposes by the Bankruptcy Court. All Creditors who hold a Claim against the Debtor, except as indicated below, may vote on the Plan by filling out the enclosed ballot and mailing it in the enclosed, self-addressed envelope or transmitting it to counsel for the Debtor.

  2. <u>Claimants Not Entitled to Vote</u>

   a. <u>Administrative Claims and Priority Tax Claims</u>

Claimants holding only Administrative Claims are not entitled to vote on the Plan because Section 1123(a)(1) of the Code does not require that such Claims be designated in a Class and because the Plan provides for the payment of such Claimants under terms which satisfy such Claimants pursuant to Sections 1129(a)(9)(A) and (C) of the Code. Sections 1122(a) and 1123(a)(1) of the Code require that a Plan proponent designate Classes of Claims, other than Administrative Claims and Priority Tax Claims, and that each Class consists of substantially similar Claims.

b. <u>Unimpaired Claims</u>

Claimants holding Claims in a Class which is not impaired (as discussed below) are not entitled to vote on the Plan because pursuant to Section 1126(f) of the Code, a Class that is not impaired under the Plan, and each Claimant in such Class, is conclusively presumed to have accepted the Plan. As a general matter, under Section 1124 of the Code, a Class of Claims is impaired unless the rights of the Claimants in such Class are not altered by the Plan (with exception of certain rights of Claimants to receive accelerated payment of their Claims and certain rights of Debtor to cure defaults) or unless the Plan provides, that, on the Effective Date, each Claimant in such Class shall receive, on account of its Claim, cash equal to the Allowed amount of such Claim. There are no Unimpaired Classes under the Plan.

3. <u>Claimants Entitled to Vote: Impaired Claims</u>

Claimants and/or Interest Holders in Classes 1, 2, 3, 4, 5, and 6 (as described below) are impaired under the Plan and Claimants and/or Interest Holders in such Classes, therefore, are entitled to vote on the Plan.

4. <u>Acceptance of the Plan</u>

Please note that the Plan is deemed accepted by a Class of Creditors when it is approved by creditors who hold at least two-thirds of the dollar amount, and who comprise more than one-half in number of, the Allowed Claims of such Class that are held by Creditors and who in fact vote. An abstention by a Creditor will not count toward either acceptance or rejection of the Plan.

**THE DEBTOR RECOMMENDS THAT EACH VOTER <u>ACCEPT</u> THE PLAN. IN ORDER FOR YOUR VOTE TO COUNT, YOUR BALLOT MUST BE COMPLETED AND RECEIVED AT THE ADDRESS STATED ON THE BALLOT (WHICH IS ALSO SET FORTH BELOW) OR TRANSMITTTED TO COUNSEL FOR THE DEBTOR ON OR BEFORE THE DATE SET FORTH ON THE BALLOT**.

SMITH KANE HOLMAN, LLC
Nicholas M. Engel, Esquire
112 Moores Road, Suite 300
Malvern, PA 19355
(610) 407-7216 Phone
(610) 407-7218 Fax
nengel@skhlaw.com

Even though a Creditor may choose not to vote or may vote against the Plan, the Creditor will be bound by the terms and treatment set forth in the Plan, if the Plan is accepted by the requisite majorities in each Class of Claimants and/or is confirmed by the Court. Allowance of a Claim for voting purposes does not necessarily mean that the Claim will be Allowed for purposes of distribution under the terms of the Plan. Any Claim to which an objection has been

or shall be made will be Allowed for purposes of distribution only after determination by the Court. Such determination may be made after the Plan is confirmed.

### C. CONFIRMATION

#### 1. Objections

Should you have an objection to Confirmation of the Plan, it must be filed, in writing, with the Bankruptcy Court and a copy caused to be received by counsel for the Debtor, on or before the date set forth in the Order approving the Disclosure Statement. A hearing to consider confirmation of the Plan will be held on the date and time set forth in the Order approving the Disclosure Statement before the Honorable Patricia M. Mayer.

#### 2. Confirmation by Acceptance

The Debtor is seeking Confirmation of the Plan under Section 1129(a) of the Code. Confirmation under Section 1129(a) is dependent upon a finding of the Bankruptcy Court that a number of requirements have been met. One of these requirements is that each Impaired Class of Claims must have accepted the Plan. Accordingly, the Plan cannot be confirmed under Section 1129(a) unless accepted by each Impaired Class of Claims.

#### 3. Confirmation Without Acceptance

While the Debtor intends to seek Confirmation of the Plan under Section 1129(a), the Debtor reserves the right to seek Confirmation of the Plan under Section 1129(b) or otherwise under the Code, notwithstanding non-acceptance by one or more Classes of Impaired Claims.

Under Section 1129(b)(1) of the Code, the Court may confirm the Plan even if it has not been accepted by one or more Impaired Classes of Claims, provided that the Plan does not discriminate unfairly and is fair and equitable with respect to each Impaired Class of Claims that has not accepted the Plan.

In order for the Plan to be fair and equitable with respect to an Impaired Class of Secured Claims, Section 1129(b)(2)(A) of the Code requires that the Plan provide for each Claimant in such Class: (a) to receive payments over time which, in the aggregate, total at least the allowed amount of such Claimant's Claim, and which have a present value, as of the Effective Date of the Plan, at least equal to the value of such Claimant's interest in the Debtor's Property encumbered by such Claimant's lien(s); and (b) shall retain such lien(s) in order to secure such payments.

In order for the Plan to be fair and equitable with respect to an Impaired Class of Unsecured Claims, Section 1129(b)(2)(B) of the Code requires that the Plan provide either: (a) that each Claimant in such Class shall receive on account of its Claim payments which have a present value, as of the Effective Date of the Plan, equal to the allowed amount of such Claim; or (b) that no Claimant or holder of an interest in the Debtor that is junior to the Claims of such impaired Class will receive or retain under the Plan on account of such junior Claim or interest any Property until the unsecured creditors are paid in full.

While the Debtor intends to seek confirmation of the Plan based on acceptance by each Impaired Class of Claims, if one or more such Classes does not accept the Plan, the Debtor intends to seek confirmation of the Plan under Section 1129(b) of the Code or otherwise under the Code and believes that the Plan satisfies the requirements of such Section.

## IV.    INQUIRIES

Inquiries by Creditors may be directed to counsel for the Debtor, SMITH KANE HOLMAN, LLC, Nicholas M. Engel, Esquire, 112 Moores Road, Suite 300, Malvern, PA 19355, Tel: (610) 407-7216, Fax: (610) 407-7218, nengel@skhlaw.com.

## V.    THE DEBTOR

The Debtor, Sacks Weston LLC, with variations in named partners and corporate forms, traces its history to the early 1980s. Since 1994, the Firm's primary practice area has been complex litigation—including class action and qui tam litigation—but it has also provided representation for clients in the areas of personal injury. The Firm's complex litigation began in the context of personal and property injuries from radioactive contamination caused by oil production operations. The Firm prosecuted dozens of actions in both state and federal courts, with the litigation culminating in a jury award of one billion dollars in punitive damages. The Firm's early complex litigation work also included prosecuting numerous other class actions, including Microsoft antitrust and Neurontin litigation. Internationally, the Firm was part of the U.S. legal team that prosecuted the European Community's RICO and money laundering claims against American, British and Japanese tobacco companies.

The current corporate form of the Firm began in January 2012, under the name Sacks, Weston & Petrelli, LLC, when the Firm expanded and diversified its practice to include an hourly-based family law practice to compliment the pending complex, contingency-based cases. By 2013, the Firm's international tobacco litigation had concluded, and the Firm further expanded its practice under the name Sacks, Weston, Petrelli & Diamond, LLC and then Sacks, Weston, Petrelli, Diamond & Millstein, LLC, beginning a series of new complex cases and bolstering its practice with lawyers handling personal injury and subrogation claims.

In 2015, the Firm changed to Sacks Weston Millstein Diamond, LLC and then Sacks Weston Diamond, LLC when the Firm no longer had its family law practice. During this time period, to finance these new complex cases, the Firm took out loans from so-called litigation funders, which are specialized lenders that generally lend to law firms to finance specific cases and those loans are collateralized with a lien on the proceeds from those specific cases. Specifically, on or about February 6, 2015, the Firm obtained litigation funding from an entity known as Series 2 - Virage Master LP, which lent the Firm the principal sum of $2,575,000.00 and collateralized that Loan with the proceeds of certain specified cases against which the money was lent, all consistent with industry custom and practice. Thereafter, on August 12, 2016, the Firm obtained an additional loan from another Virage-related entity known as Series 4 – Virage Master LP under similar terms to the foregoing loan from Series 2 – Virage Master LP.

6

Subsequently, on June 5, 2017, the Firm—which at the time was called Sacks Weston Diamond, LLC—entered into a loan agreement with Virage SPV 1 LLC ("Virage") that effectively refinanced and consolidated the two aforementioned Virage Master LP loans and provided a small additional advance of funds (the "Virage Loan").  In total, the promissory note signed in connection with the Virage Loan was for the amount of $5,794.960.92.  The guarantors for the Virage Loan were the Firm principals at that time, Andrew B. Sacks ("Sacks"), John K. Weston ("Weston") and Scott E. Diamond ("Diamond").

The Firm believed and indeed treated the Virage Loan in a manner similar to all prior loans with Virage-related entities insofar as the proceeds from the specific cases funded by Virage would act as collateral for the Virage Loan.  Nevertheless, the Virage Loan terms were onerous and had viability only if the Firm was able to recover on cases relatively quickly because the principal balance of the loan accrued interest at a stated annual rate of 22.5% and was secured by certain of the Firm's case proceeds (the "Virage Collateral") where 60% of such proceeds—i.e., more than half of whatever the Firm recovered—were required to be paid to Virage upon receipt by the Firm.  The stated maturity date of the Virage Loan was June 5, 2021.

In July 2020, the Firm terminated Diamond and removed him as a member of the Firm because of alleged fraud involving the diversion of Firm revenues.  As a result, the Firm name was changed to its present name, Sacks Weston LLC.  The combined economic consequences associated with the staggering amount of the Firm's revenues being wrongfully diverted and the ensuing upheaval occurring at the Firm through the loss of what was thought to be an integral part of the Firm's practice and cash flow, caused the Firm to identify possible refinancing sources to address the impending Virage Loan maturity date in June 2021.  Unfortunately, despite the fact that the Firm was able to secure refinancing commitments through multiple lenders, the amount of funding was insufficient to cover the exorbitant interest being charged by Virage, and when Virage refused to compromise its indebtedness, the Firm was not able to refinance the Virage Loan or retire it by the June 6, 2021 maturity date.  Instead, Virage agreed only to formally extend the loan maturity date for a mere three weeks until June 26, 2021.

On June 24, 2022, the United States Attorney's Office charged Diamond with one count of mail fraud and one count of wire fraud.  In November 2022, Diamond pled guilty to the charges, and Diamond was sentenced to six months imprisonment and was required to pay restitution to the Firm in the amount of $319,931.13—an amount far less than what was believed to have been diverted from the Firm.

On March 24, 2023, Virage filed suit against the Firm and the guarantors of the Virage Loan (the "Virage Suit") in the Court for the 152nd Judicial District of Harris County, Texas (the "Harris County Court").  On August 18, 2023, the Harris County Court entered a temporary injunction, which directed the Firm (and other named defendants) to: (1) refrain from transferring, selling, or encumbering certain claimed collateral, (2) disclose to Virage the payment status and identity of the claimed collateral, and (3) deposit 60% of certain claimed collateral proceeds into the Registry of the Harris County Court within 7 days (the "Temporary Injunction").

Without sufficient working capital, the Firm would be rendered inoperable, thereby preventing it from servicing its existing files (which are believed to have value in the millions) and from taking on new cases. Accordingly, on August 25, 2023 (the "Petition Date"), the Firm had no choice but to file its voluntary petition under chapter 11 of the Bankruptcy Code.

The Debtor retained Smith Kane Holman, LLC to serve as its bankruptcy counsel in these Chapter 11 cases. The Order approving the retention of Smith Kane Holman, LLC as counsel was entered by this Court on September 11, 2023, effective as of the date the application was filed on August 25, 2023.

Since its Chapter 11 filings, the Debtor has continued its work on its prepetition cases and to operate in the ordinary course. The Debtor received initial authority from the Bankruptcy Court to use Virage's cash collateral, but since that time has been self-funding its operations through contributions from either or both of the shareholders of the Debtor's sole member.

Subsequent to the filing of this chapter 11 case, a non-Debtor defendant in the Virage Suit removed all claims and causes of action to the United States District Court for the Southern District of Texas, pending at Case No. 4:23-cv-03292. The non-Debtor defendant has moved to have these claims and causes of action transferred to the United States District Court for the Eastern District of Pennsylvania (and ultimately this bankruptcy case), while Virage has moved to have the claims and causes of action remanded to the Harris County Court.

On February 14, 2024, the Bankruptcy Court entered an Order holding that Section 552 of the Code does not extinguish or alter any prepetition lien that Virage claims to hold on the Debtor's cases that originated prior to the bankruptcy filing, including any Proceeds from such cases that the Debtor earned after the bankruptcy filing. Thus, assuming that Virage has a valid and secured claim against those cases (which the Debtor disputes), the Debtor's unsecured creditors in this case may be paid only from proceeds of cases that originate after the bankruptcy was filed. As a relevant corollary, should the Debtor not achieve reorganization and/or its case be dismissed, then: (i) Section 552 of the Code would not apply, (ii) Virage's secured claim (if any) would encumber all of the Debtor's cases originated before and after the bankruptcy, and (iii) unsecured creditors would not recover any amounts on account of their claims until the Virage claim is paid in full.

### VI.  THE CHAPTER 11 PLAN

#### A.  SUMMARY OF THE PLAN

The Plan provides for varied and customized treatment to the various Classes of Claims against the Debtor. The Debtor believes the Plan provides consideration to all Classes of creditors that reflects an appropriate resolution of their claims against the Debtor. The Debtor also believes the Plan will provide each Class of creditors with consideration of equal or greater value than that which the Class members would receive upon liquidation of the Debtor's assets. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of holders of Claims

that do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

The provisions below summarize the Plan. Reference should be made to the Plan for a full statement of its terms. The following summary is qualified in its entirety by reference to the Plan.

PLEASE NOTE THAT THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN. THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN BY EACH HOLDER OF A CLAIM ENTITLED TO VOTE THEREON; IT IS INTENDED ONLY TO AID AND SUPPLEMENT SUCH REVIEW. HOLDERS OF CLAIMS ARE URGED TO REVIEW THE DETAILED DESCRIPTION OF THE PLAN SET FORTH HEREIN AND THE PLAN ITSELF FOR A FULL UNDERSTANDING OF THE PLAN. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN.

In the Debtor's opinion, the Plan as proposed provides maximum value to its Creditors. The Debtor believes that the Plan will enable Claimants to receive a greater recovery than would be possible under other alternatives and will provide the only realistic available means for funding a distribution to unsecured creditors.

The Plan divides Claimants and Interest Holders into 6 Classes. The nature of the Claims/Interests within each class and their treatment under the Plan are summarized below. It should be noted, however, that the following summary of the Plan does not propose to be a full analysis of its provisions and should not be relied on as such. All Claimants are encouraged to review the Plan in its entirety in conjunction with the review of the Disclosure Statement and to consult with counsel, as necessary.

Claimants should note that the amount to be paid on account of Claims under the various provisions of the Plan will be calculated on the basis of the allowed amount of the Claims, determined in accordance with the Code. Claimants that were listed in the Debtor's schedules as unliquidated, disputed and/or contingent and who have not filed Proofs of Claim within the times set by the Court will receive no distribution. Those Claimants who are listed on the Debtor's schedules as liquidated, undisputed and not contingent will be paid based on the amount set forth in the schedules, unless the Claimant has filed a Proof of Claim for an amount different from that amount listed on the schedules. Those Claimants who have filed Proofs of Claims will be paid based on the amounts set forth in a properly filed Proof of Claim, unless the Debtor objects to the Proof of Claim. Claimants who have filed Proofs of Claim to which the Debtor objects will receive payment based on such amount as the Court determines to be allowed, and distribution on account of such Claims will be effected in the majority of instances, 30 days after the entry of the Final Order allowing such disputed claim, or on the date for payment set forth in the Plan, whichever is later.

It should also be noted that the actual distribution to a particular Claimant may be less than that proposed under the Plan, if the Claimant agrees to accept such different treatment.

9

B.  CLASSIFICATION AND TREATMENT OF CLAIMS

1. <u>Administrative Expenses</u>.

Administrative Claims consist of the actual and necessary expenses incurred during the Debtor's chapter 11 case (i.e., post-bankruptcy obligations), including the actual, reasonable fees and expenses of professionals retained in the Cases. The Plan provides that Administrative Claims of the kinds specified in Section 507(a)(2) of the Code will be paid in full, except to the extent that any Claimant agrees to different treatment, (i) in Cash on the Effective Date, or (ii) in accordance with the credit terms extended by the creditor of such obligations, or (iii) as required by law.

The Plan also provides that fees and expenses of professionals will be paid in full upon approval by the Bankruptcy Court or as otherwise permitted under the Plan or under the Bankruptcy Rules. In these Cases, the professional fees and expenses consist of the Debtor's counsel Smith Kane Holman, LLC and possibly accountants for the Debtor, if employed by the Debtor.

The Court-approved attorneys' fees of Smith Kane Holman, LLC, counsel to the Debtors, shall be assumed by the sole member (and its principals) of the Debtor, and shall be paid in an amount and over a period of time as is acceptable to Smith Kane Holman, LLC in its sole discretion. These professional fee payments shall be part of the New Value Contribution in favor of Allowed Administrative Claims of Professionals. At the time of filing, Smith Kane Holman, LLC estimates its fees and costs to be approximately $125,000.00, with another approximately $25,000.00 to be incurred through confirmation of the Plan.

2. <u>Priority Tax Claims</u>.

The Debtor proposes to pay Allowed Priority Tax Claims, if any, in cash, in an amount equal to such Allowed Priority Tax Claim, at the option of the Debtor, (a) on the Effective Date or (b) in equal quarterly installments commencing on the first Business Day of the month following the Effective Date and continuing thereafter, with interest at a rate of 4% per annum, through July 2028, or as otherwise agreed by the Taxing Authority, pursuant to Section 1129(a)(9)(C).

The Debtor is not aware of any Priority Tax Claims and therefore did not schedule any in its bankruptcy schedules. Nevertheless, the City of Philadelphia filed a Priority Tax Claim purportedly for a wage tax penalty owing in 2012 in the amount of $212.68. While the Debtor disputes that liability, if it is allowed, the Debtor will likely pay it in full on the Effective Date, given the nominal amount alleged to be owing.

3. <u>Secured Claim of Virage SPV 1 LLC (Class 1)</u>.

Class 1 consists of the Secured Claim of Virage, if any, by virtue of its asserted security interest in the Virage Collateral. Virage's Secured Claim is Impaired and, thus, Virage is entitled to vote to accept or reject the Plan on account of its Class 1 Secured Claim.

To the extent that Virage is determined to have an Allowed Secured Claim, Virage shall receive all Virage Collateral Case Proceeds arising from any Virage Collateral Case on which Virage is determined to have a Lien.

Virage shall have a Class 3 Claim as follows: (1) to the extent there are remaining sums due owing to Virage on account of its Allowed Claim after all of the Virage Collateral Cases have concluded and after all of the Virage Collateral Case Proceeds have been paid to Virage or (2) the Court has entered a Final Order determining the amount of Virage's Deficiency Claim, whichever occurs earlier (a "Virage Deficiency Event").

Virage shall retain its Lien, if any, on the Virage Collateral to the same extent, priority, and validity it is determined to have held as of the Petition Date and shall be deemed to be paid in full on account of its Class 1 Claim upon receipt of all Virage Collateral Case Proceeds to the extent that Virage has a Lien on same.

      4.      <u>Secured Claim of the Commonwealth of Pennsylvania (Class 2)</u>.

Class 2 consists of the Secured Claim of the Commonwealth of Pennsylvania (the "Commonwealth"), if any, by virtue of its security interest in the Debtor's property. Although the Debtor has not been able to confirm what, if anything, is still owing to the Commonwealth, the UCC filing refers to annual dues assessed against a professional limited liability company for each professional that is a member in the limited liability company. The Commonwealth's Secured Claim is Impaired and, thus, the Commonwealth is entitled to vote to accept or reject the Plan on account of its Class 2 Secured Claim.

The Reorganized Debtor shall pay the Commonwealth on account of its Allowed Secured Claim in six equal monthly installments commencing on the first Business Day of the month following the Effective Date and continuing for the ensuing five months thereafter.

The Commonwealth shall retain its liens on the Debtor's property to the same extent, priority, and validity as it held as of the Petition Date until it is paid pursuant to the terms of this Plan.

      5.      <u>Virage Deficiency Claim (Class 3)</u>.

Class 3 consists of the Deficiency Claim, if any, of Virage that would arise if Virage's allowed Class 1 Claim exceeds the value of the Collateral securing same. Class 3 is Impaired and, thus, Virage is entitled to vote to accept or reject the Plan on account of its Class 3 Claim.

The Class 3 Allowed Claim shall be paid, Pro Rata with all Class 4 Creditors, from all funds in the Unsecured Creditor Escrow Fund on the Initial Unsecured Creditor Distribution Date and then again on the Final Unsecured Creditor Distribution Date. Notwithstanding the foregoing, within 15 calendar days of each of the first, second, and third anniversaries after the Effective Date, if the Class 3 Creditor has an Allowed Unsecured Claim as of those dates, it shall be entitled to a Pro Rata distribution of the Guaranteed Unsecured Creditor Payment that exists as of that time. If the Class 3 Creditor does not have an Allowed Claim as of the date of any

11

such annual distribution, it shall not be entitled to a distribution from the Guaranteed Unsecured Creditor Payment.

The treatment and consideration to be received by the holder of the Class 3 Claim shall be in full settlement, satisfaction, release, and discharge of its Unsecured Claim.

6. <u>General Unsecured Claims (Class 4)</u>.

Class 4 consists of General Unsecured Claims except those set forth in Class 3 and in Class 5. Class 4 is Impaired and, thus, Class 4 Claimants are entitled to vote to accept or reject the Plan.

Class 4 Allowed Claims shall be paid, Pro Rata with the Class 3 Creditor, from all funds in the Unsecured Creditor Escrow Fund on the Initial Unsecured Creditor Distribution Date and then again on the Final Unsecured Creditor Distribution Date. Notwithstanding the foregoing, within 15 calendar days of each of the first, second, and third anniversaries after the Effective Date, all Class 4 Creditors with an Allowed Unsecured Claim as of those dates shall be entitled to a Pro Rata distribution of the Guaranteed Unsecured Creditor Payment that exists as of that time. Any Class 4 Creditor that does not have an Allowed Claim as of the date of any such annual distribution shall not be entitled to a distribution from the Guaranteed Unsecured Creditor Payment.

The treatment and consideration to be received by holders of Class 4 Claims shall be in full settlement, satisfaction, release, and discharge of their respective Claims. Based upon the Debtor's estimation of Allowed Class 4 Claims in the amount of $537,995.91,[1] and assuming that no payment will be made to Class 3 because a Virage Deficiency Event will not yet have occurred, the Debtor estimates the percentage distribution to Class 4 Allowed Claims will be at least 7.17% (based on the Guaranteed Unsecured Creditor Payment alone) with additional claim objections and/or the Debtor's payment of any Net Income increasing the return for Class 4 Claimants.

7. <u>Unsecured Claim of Sacks & Weston (Class 5)</u>.

Class 5 consists of the Unsecured Claim in the principal amount of $688,321.41 of Sacks & Weston, a professional corporation, which is the holder of the Interest in the Debtor. Class 5 is Impaired and, thus, the Class 5 Claimant is entitled to vote to accept or reject the Plan.

The Class 5 Creditor shall be paid from any funds remaining in the Unsecured Creditor Escrow if and only if Class 3 and Class 4 have been paid in full. Sacks & Weston has agreed to voluntarily subordinate its claim to the claims of all other unsecured in order to increase the amount distributed to unsecured creditors.

---

[1] The Debtor believes that the Proof of Claim filed by Scott Diamond (the former partner of the Debtor who was convicted of fraud) in the amount of $500,000 is meritless; accordingly, the Debtor intends to object to this claim. The Debtor also believes that, due to PNC Bank's realization of full payment from a non-Debtor guarantor on its loan to the Debtor, PNC Bank's claim against the Debtor has been satisfied.

12

The treatment and consideration to be received by the holder of the Class 5 Claim shall be in full settlement, satisfaction, release, and discharge of its Claim.

       8.      <u>Interest Holders (Class 6)</u>.

Class 6 consists of Sacks & Weston, a Pennsylvania professional corporation, which holds of all Interests in the Debtor. Class 6 is impaired and consequently the holder of the Class 6 Interests is entitled to vote on the Plan.

On the Effective Date, all Interests in the Debtor shall transfer and become Interests in the Reorganized Debtor for the purpose of fulfilling the obligations of the Reorganized Debtor under the Plan; the holder of Interests shall not receive any distributions on account of such Interests, unless and until all Creditors are paid in full in accordance with the Plan.

**VII.**    **<u>MEANS FOR EXECUTING PLAN</u>**

    A.    PLAN FUNDING AND FEASIBILITY

       1.    <u>Generally</u>. The funds necessary for the implementation of the Plan shall originate from multiple sources.

First, the Debtor is litigating the amount of, and extent of any collateral securing, the claim of Virage, its putative secured creditor. Specifically, Virage believes that it has a claim that is secured by all of the Debtor's cases that existed as of the Petition Date and that the value of those cases is less than the amount owing to Virage. If so, there is no part of the Debtor's cases that existed as of the Petition Date that could be recovered for the benefit of its unsecured creditors. If the Debtor is successful in the foregoing litigation, the Debtor will provide a return to its unsecured creditors from the Proceeds of its cases that existed as of the Petition Date and that are not part of the Virage collateral. In the meantime, the Proceeds for all such cases shall be safekept in a separate escrow account known as the Secured Creditor Escrow Account under the Plan. The Plan then provides for the payment of such funds either to Virage to the extent that Virage is successful in the litigation or to the Debtor to be paid to unsecured creditors by funding the Unsecured Creditor Escrow Account to the extent that the Debtor is successful in the litigation.

Second, the Debtor is proposing to devote all its income, after payment of its ordinary expenses, for the period commencing upon the Effective Date of its Plan and continuing for a period of three years. Any such Net Income will be deposited quarterly into the Unsecured Creditor Escrow Account during the aforesaid three-year period. Because of the uncertainties involving whether Virage will have a Deficiency Claim (which would be an Unsecured Claim in Class 3) and the effect that it will have on the distribution to unsecured creditors as a whole, distributions will not occur with respect to unsecured creditors until the amount and the extent of the Virage Secured Claim is determined and any cases constituting Virage's collateral have been liquidated.

Third, Administrative Claims, which the Debtor estimates will be approximately $150,000 through Plan confirmation and which have a priority over general unsecured claims, will be paid through the New Value Contribution by the principals of the Interest holder (i.e., the sole owner of the membership interests in the Debtor). In addition, those same principals will not receive compensation as part of the ordinary expenses to be paid during this period. Accordingly, the Debtor is maximizing the Net Income available to distribute to unsecured creditors. Furthermore, through their New Value Contribution, the principals of the Interest holder will also be funding operations to the extent that cash does not exist to do so. Through this funding, the Debtor will be able to continue operations, which creates the possibility of a return to unsecured creditors from Net Income, where likely no return would exist if operations ceased.

Fourth, the holder of an Interest in the Debtor will make payments for the benefit of unsecured creditors in the aggregate amount of $75,000 in annual installments of $25,000.00 each on the first, second and third anniversaries of the Effective Date. This is referred to as the Guaranteed Unsecured Creditor Payment under the Plan and is a mechanism to ensure that unsecured creditors will receive some distribution under the Plan regardless of the ultimate success of the various other funding mechanisms.

Finally, although not an actual funding source, the Interest holder in the Debtor will subordinate debt in the principal amount of $688,321.41 to the debt of all other unsecured creditors. This will have the practical effect of decreasing the overall class of unsecured creditors in Class 4, thereby increasing the Pro Rata return to all such creditors.

2. <u>Ability to Initially Fund the Plan</u>. The funding needed by the Reorganized Debtor to continue operations will be sourced from the New Value Contribution. The shareholders of the Debtor's sole member will provide the cash needed to fund any shortfalls in the Reorganized Debtor's operations. By doing so, this will preserve the possibility of Net Income payable to creditors during the three-year period after the Effective Date. Also, the same shareholders will fund the Guaranteed Unsecured Creditor Payment in the amount of $75,000, which ensures some return to unsecured creditors even if all other available funding mechanisms prove fruitless.

3. <u>Ability to Make Future Plan Payments and Operate Without Further Reorganization</u>. The Debtor projects that it will have enough cash over the life of the Plan to make the required Plan payments. The Guaranteed Unsecured Creditor Payment will be funded by the Debtor's sole Interest holder, and each Class will receive payment from the Proceeds of the Virage Collateral Cases and the Post-Petition Cases as those proceeds are realized by the Debtor and as set forth in the Plan's treatment of each Class.

The New Value Contribution shall be utilized as the requisite "new value" for confirmation of this Plan under 11 U.S.C. §1129(b), if necessary.

4. <u>Post-Effective Date Fees and Expenses</u>. From and after the Effective Date, the Reorganized Debtor shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professional persons

14

thereafter incurred, including, without limitation, those fees and expenses incurred in connection with the implementation and consummation of the Plan.

B. **DEBTOR'S ASSETS.** Unless otherwise stated, on and after the Effective Date, all assets of the Debtor's estate shall vest in the Reorganized Debtor free and clear of any and all liens, mortgages, pledges, security interests, restrictions, prior assignments, liabilities, obligations, encumbrances, charges, and claims of every kind whatsoever, subject only to the Liens specifically preserved by the Plan.

## VIII. ALTERNATIVES TO THE PLAN AND LIQUIDATION ANALYSIS; RISKS

The Plan is proposed by the Debtor in the good faith belief that considerably more will be realized by the Claimants through the implementation of the Plan than would be the case if the Debtor's Assets were liquidated under Chapter 7 of the Code. If confirmed, the Plan contemplates that Class 1 and Class 2 Secured Creditors will be paid in full. As set forth above, the Debtor estimates that Class 4 Creditors will receive a return of at least 7.17% on account of their Allowed Unsecured Claims and, to the extent that the Debtor realizes Net Income in the three-year period following the Effective Date, the anticipated percentage return to unsecured creditors could increase. The Plan allows the Debtor to monetize its remaining assets in a way that will fully fund payments to secured Creditors and provide a return to unsecured creditors.

The Debtor asserts that in a chapter 7 liquidation, Class 3 and Class 4 would receive nothing from the bankruptcy estate if Virage is determined to have a valid lien on all of the Debtor's cases and that *any distribution* to Class 3 and Class 4 Creditors under the Plan is more than they would receive in a chapter 7 liquidation. The Guaranteed Unsecured Creditor Payment and the Debtor's Net Income would not be available to Class 3 and Class 4 Creditors *under any other circumstance* other than the proposed Plan. Thus, the best interests of the Debtor and its creditors would be served by acceptance of the Plan.

Nevertheless, the Debtor's Plan poses risks.

Specifically, due to the uncertainties with respect to the ultimate outcome of the Virage Pending Litigation, the Debtor is unable to project the amount of Virage Collateral Case Proceeds (i.e., the proceeds on account of cases existing as of the Petition Date on which Virage asserts a lien), if any, that will be payable to unsecured creditors.

Furthermore, given the uncertainties involving the amount and timing of payment on account of any post-bankruptcy contingency fee cases, the Debtor similarly cannot project the Net Income that is likely to be paid to unsecured creditors during the applicable three-year period. Also, the Reorganized Debtor's Net Income is dependent upon its ability to successfully originate and prosecute cases. However, the Debtor has a long history of successful cases, and its ability to continue operations could result in meaningful distributions under the Plan over and above the Guaranteed Unsecured Creditor Payment.

Accordingly, the Plan has some natural and unavoidable uncertainties and associated risk to unsecured creditors. Nevertheless, and even if no Net Income is realized by the Debtor, the

15

Guaranteed Unsecured Creditor Payment will provide $75,000 in total funds for payment toward Unsecured Claims.  Assuming that this payment is made solely to Allowed Class 4 Claims in the estimated amount of $537,995.91, the recovery of Class 4 Claimants on account of their Claims will be at least 7.17% and likely more given the possibility of other valid claim objections.  Should the Debtor realize Net Income during the three-year period following the Effective Date, the funds payable to unsecured creditors will increase.  Alternatively, if the Debtor is unable to reorganize and its case is dismissed, unsecured creditors will receive nothing on account of their Claims if Virage has a lien on all prepetition and post-petition cases of the Debtor.

## IX.  TAX CONSEQUENCES

The Debtor believes that if the Plan is confirmed by the Bankruptcy Court, there may be tax consequences that could affect individual creditors.  You are urged to consult with your tax advisors regarding such implications and how they may affect you.

## X.  SUMMARY OF MISCELLANEOUS PROVISIONS

### A.  EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Pursuant to Section 365 of the Code, the Debtor has the right to reject executory contracts or leases.  As more specifically set forth in the Plan, all executory contracts are rejected pursuant to Sections 365 and 1123(b)(2) of the Code upon the Confirmation Date, unless specifically assumed pursuant to the Plan or by separate motion.  Any Claim for damages arising by reason of the rejection of any executory contract or unexpired lease will constitute a Class 4 Claim.

### B.  MODIFICATION OF THE PLAN

At any time before the Confirmation Date, the Debtor may modify this Plan, but may not modify the Plan so that the Plan, as modified, fails to meet the requirements of Sections 1122 and 1123 of the Code.   The Plan as modified under this Section becomes the Plan only if the Court, after notice and a hearing, confirms such Amended Plan, as modified, under Section 1129 of the Code. After the Confirmation Date, the Debtor may, with the approval of the Court, and as long as it does not materially or adversely effect the interest of Claimants, remedy any defect or omission, or reconcile any such inconsistencies in the Plan or in the Confirmation Order, in such manner as may be necessary to carry of the purposes, intent and effect of the Plan.

### C.  BANKRUPTCY COURT JURISDICTION

As more specifically set forth in Article XII of the Plan, the Bankruptcy Court shall retain jurisdiction after the Plan has been confirmed.

### D.  OBJECTIONS TO CLAIMS

The Plan provides that within 90 days after the Effective Date, objections to Claims may be filed with the Court by the Debtor.  Any such objection shall be served upon the United States

Trustee and the Claimant holding the Claim to which objection is made. The Debtor anticipates filing objections to the Claims of Virage and Scott Diamond.

E.  DISCHARGE

Pursuant to Section 1141(d)(1) of the Code, the Debtor shall be discharged and released of all Claims arising prior to the Effective Date, other than those Claims arising pursuant to and in accordance with the terms of the Plan.

A.  FINAL DECREE

The Plan also provides that Debtor shall move for the entry of a final decree closing the within Chapter 11 cases following the Effective Date.

B.  FREQUENTLY ASKED QUESTIONS

1.  **What is Sacks Weston LLC attempting to do in Chapter 11?** Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor attempts to restructure the claims held against it. Formulation and confirmation of a plan of reorganization is the primary goal of Chapter 11. When reorganization is not feasible, however, a debtor may propose a liquidating plan under Chapter 11. The plan is the legal document which sets forth the manner and the means by which holders of claims against a debtor will be treated.

2.  **If the Plan of Reorganization is the document that governs how a claim will be treated, why am I receiving this Disclosure Statement?** In order to confirm a plan of reorganization, the Bankruptcy Code requires that a debtor solicit acceptances of a proposed plan, which it is doing with this Disclosure Statement. If the creditors are satisfied with the information provided in the Disclosure Statement and the terms of the Plan as proposed, and have voted for the Plan and returned the requisite number of ballots to counsel for the debtor, the Bankruptcy Court may confirm the plan as proposed by the debtor.

3.  **How do I determine which class I am in?** To determine the class of your claim or interest, you must first determine whether your claim is secured or unsecured. Your claim is secured if you have a validly perfected security interest in collateral owned by the Debtor. If you do not have any collateral, or your security interest is subordinate to the senior secured lender of the Debtor, your claim is unsecured. Article IV.B. above lists all classes of claimants and their proposed treatment under the Plan.

4.  **Why is confirmation of a Plan of Reorganization important?** Confirmation of the Plan is necessary because if the Plan is confirmed, the Debtor and all of its creditors are bound by the terms of the Plan. If the Plan is not confirmed, the Debtor may not pay creditors as proposed in the Plan while the Debtor remain in bankruptcy.

5.  **What is necessary to confirm a Plan of Reorganization?** Confirmation of the Plan requires, among other things, the vote in favor of the Plan of two-thirds in total dollar

17

amount and a majority in number of claims actually voting in each voting class. If the vote is insufficient, the Bankruptcy Court can still confirm the Plan, but only if certain additional elements regarding the ultimate fairness of the Plan to the creditors are shown.

6. **Am I entitled to vote on the Plan?** Any creditor of the Debtor whose claim is IMPAIRED under the Plan is entitled to vote, if either (i) the creditor's claim has been scheduled by the Debtor and such claim is not scheduled as disputed, contingent, or unliquidated, or (ii) the creditor has filed a proof of claim on or before the last date set by the Bankruptcy Court for such filings. Any claim to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court temporarily allows the creditor to vote upon the creditor's motion. Such motion must be heard and determined by the Bankruptcy Court prior to the date established by the Bankruptcy Court to confirm the Plan.

7. **How do I determine whether I am in an Impaired Class?** Article IV.B. above identifies the classes of creditors whose claims are impaired. If your claim is impaired, your vote will be considered by the Bankruptcy Court.

8. **When is the deadline by which I need to return my Plan Ballot?** The Plan is being distributed to all claim holders for their review, consideration and approval. The deadline by which ballots must be returned is _____. Ballots should be mailed to the following address: Nicholas M. Engel, Esquire, Smith Kane Holman, LLC, 112 Moores Road, Suite 300, Malvern, PA 19355.

9. **How do I determine when and how much I will be paid?** Article IV.B. above sets forth how much each class of creditors will receive under the Plan.

|  |  |
|---|---|
|  | Respectfully Submitted, |
|  | SACKS WESTON LLC |
| Date: February 21, 2024 | By: /s/ *Andrew B. Sacks* <br> Andrew B. Sacks, Manager |
|  | SMITH KANE HOLMAN, LLC |
| Date: February 21, 2024 | By: /s/ *Nicholas M. Engel* <br> Nicholas M. Engel, Esquire <br> David B. Smith, Esquire <br> 112 Moores Road <br> Suite 300 <br> Malvern, PA 19355 <br> (610) 407-7216 Phone <br> (610) 407-7218 Fax <br> *Attorneys for Debtor-in-Possession* |

18